**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE:<br><br>**SCIENCE APPLICATIONS INTERNATIONAL CORP. (SAIC) BACKUP TAPE DATA THEFT LITIGATION**<br><br>_____<br><br>**This Document Relates To:**<br><br>**ALL CASES** | Misc. Action No. 12-mc-347 (RLW)<br>MDL No. 2360 |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs Thomas Adcock, Fernando Arellano, Michael Bacon, Donald J. Bates, James F. Biggerman, Jr., Robert Curtis, Ella Deatrick, Michael Erickson, Virginia E. Gaffney, Shanna Hartman, Jeff Hawk, Juan Diego Hernandez, Val Johnson, Carol Keller, Mark Losack, Theodore Martin, Susie Moss-McUmber, Benny Miller, Antonette Morelli, Murry B. Moskowitz, Alfred Newman, Colleen O'Hara-Epperly, Jessica Palmer, Amandah Peting, Jennifer Pineirovigo, Nha Reznikov, Allie J. Richardson III, Kyle Roe, Cecil Trower, Matthew Walters, Robin Warner, Celia Worrell and Dorothy Yarde (collectively, "Plaintiffs"), on behalf of themselves and all other persons similarly situated, bring this action against Defendants TRICARE Management Activity ("TRICARE"), the agency administering the TRICARE health care program to Uniformed Service members, retirees and their families; Science Applications International Corporation ("SAIC"), the government contractor for TRICARE; the United States Department of Defense ("DOD"); and Leon Panetta, in his Official Capacity as Secretary of the DOD ("Panetta" or "Secretary") (collectively, "Defendants").  Plaintiffs bring this action based upon

personal knowledge as to their own acts and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

## NATURE OF THE ACTION

1.        Plaintiffs, individually and on behalf of all other similarly situated persons (*i.e.*, the Class Members)[1] bring this national consumer class action seeking to redress Defendants' intentional, willful and reckless violations of their privacy rights.  Plaintiffs and Class Members are consumers of health care coverage, medical and dental care, medical and dental products and services and/or medications who entrusted their personally identifiable information ("PII") and medical records and private health information ("PHI") (together, "PII/PHI") to Defendants. Defendants betrayed Plaintiffs' trust by failing to properly safeguard and protect their PII/PHI and publicly disclosing their PII/PHI without authorization in violation of numerous laws, including, *inter alia*, the Administrative Procedures Act ("APA"), the Fair Credit Reporting Act ("FCRA"), the federal Privacy Act of 1974 ("Privacy Act"), and the statutes and common law of various states.

2.        Plaintiffs and Class Members are active and former military servicemen and servicewomen and their families geographically dispersed throughout the United States and stationed overseas.

3.        Defendant TRICARE provides health insurance to Plaintiffs and Class Members. As their health insurance provider, TRICARE is entrusted with the PII/PHI of millions of people who are serving or have faithfully served our country, including Plaintiffs and Class Members. As such, TRICARE is required to safeguard, protect and maintain the privacy of such

---

[1] Defendants initially announced that over 4.9 million people were impacted by the Data Breach, but later revised the number downward to slightly over 4.7 million people.

information pursuant to numerous laws and regulations including, *inter alia,* the APA and the Privacy Act.

4.      Defendant DOD, by and through the Secretary, provides medical and dental care, medical and dental products and services and medications to Plaintiffs and Class Members.  As such, DOD and the Secretary is also entrusted, and required to safeguard, protect and maintain the privacy of such PII/PHI pursuant to numerous laws and regulations including, *inter alia,* the APA and the Privacy Act.

5.      Defendant DOD, by and through the Secretary, contracts with Defendant SAIC to provide a variety of services, including electronic information management and data security services for safeguarding and protecting Plaintiffs' and Class Members' PII/PHI entrusted to Defendants in connection with obtaining health care coverage, medical and dental care, medical and dental products and services and/or medications.  Pursuant to these contracts, DOD pays SAIC tens of millions of dollars per year.  For example, in May 2011, DOD renewed its contract with SAIC to provide these services under a three-year contract valued at $53 million.  On or about February 6, 2012, after the unlawful disclosure of Plaintiffs' and Class Members' PII/PHI in question here, DOD again extended the contract.

6.      On September 29, 2011, TRICARE publicly admitted that on or about September 12, 2011, Plaintiffs' and Class Members' PII/PHI was unlawfully disclosed (the "Data Breach" or the "Disclosure").  Plaintiffs' and Class Members' PII/PHI was contained on backup data tapes transported by a low level SAIC employee in his personal vehicle in an unsecure manner. The data tapes were taken from the SAIC employee's personal vehicle while it was parked in downtown San Antonio, Texas and left unattended for over eight hours.

7.      The wrongfully disclosed PII/PHI included, *inter alia*, Plaintiffs' and Class Members' Social Security numbers, addresses, dates of birth, telephone numbers and personal health data—including private medical records, health provider information, laboratory test results, medical diagnoses and prescription medication information.   This type of PII/PHI disclosure is the most harmful because it generally takes a significant amount of time for a victim to become aware of the disclosure.   Improper use of PII also can result in an adverse impact on a victim's credit rating and finances.

8.      Defendants flagrantly disregarded Plaintiffs' and Class Members' privacy rights by intentionally, willfully and recklessly failing to take the necessary precautions required to safeguard and protect Plaintiffs' and Class Members' PII/PHI from unauthorized disclosure. Plaintiffs' and Class Members' PII/PHI was improperly handled and transported, either unencrypted or improperly partially encrypted, unprotected, readily able to be copied by data thieves and not kept in accordance with basic security protocols.   Defendants inexplicably failed to properly encrypt the information, and then intentionally, recklessly and willfully allowed an untrained or improperly trained low level employee to transport the PII/PHI in an unsecure manner.   Defendants compounded their dereliction of duty when their improperly trained agent left the PII/PHI unattended for eight hours in an unguarded car parked in a public location—all of which directly and/or proximately resulted in its theft and dissemination to the world by an unknown party or parties.

9.      Defendants' intentional, willful and reckless disregard of Plaintiffs' and Class Members' privacy rights caused one of the largest unauthorized disclosures of PII/PHI in history.

10.     On December 2, 2011, five members of Congress wrote a letter to TRICARE criticizing Defendants' conduct pertaining to the Data Breach.   *See* December 2, 2011 Letter

from Congress Members Markey, Barton, DeGette, Stearns and Andrews to TRICARE ("First Congressional Letter"), *available at*: http://markey.house.gov/docs/2011_1202_letter_to_director_of_tricare.pdf.

11.     The First Congressional Letter expresses Congress' "deep concerns about a major breach of personally identifiable and protected health information," and accurately observes that "[t]his breach by a firm responsible for handling the military health provider's patient data represents an extremely serious and substantial lapse in security."

12.     The First Congressional Letter also poses numerous questions about the security defects that caused the Data Breach. Although the letter demanded a written response by February 2, 2012, TRICARE failed to respond until after that deadline.

13.     TRICARE's response is confidential, but it was so plainly inadequate that the Congressmen wrote a second letter to TRICARE. *See* May 7, 2012 Letter from Congress Members Markey, Barton, DeGette, Stearns and Andrews to TRICARE ("Second Congressional Letter"), available at http://www.phiprivacy.net/wp-content/uploads/5-7-12-Response-to-TRICARE.pdf.

14.     The Second Congressional Letter is also highly critical of TRICARE—opening with a statement that TRICARE's response:

> [F]ails to address many of our concerns. In fact, it raises a number of additional significant questions about the TRICARE's ability to protect the health privacy of members of our military. Protection of the personal health information of our men and women serving the military is not only a privacy issue. It is a national security imperative. *We remain deeply concerned that TRICARE is not adequately safeguarding this sensitive information, to the detriment of millions of service members and family.* Accordingly, we call on TRICARE to promptly implement major, meaningful reforms to ensure the security of the personal health information it collects, maintains, and manages on behalf of those who serve in the Armed Forces.

(emphasis added).

15.     The Second Congressional letter also notes that "[a]t a minimum TRICARE should require that its contractors, including SAIC, encrypt data before transporting it to a different location.  Yet even after experiencing multiple instances of physical data theft . . . TRICARE still does not mandate that its contractors handling sensitive information implement such a commonsense risk mitigation practice.  This is unacceptable."

16.     The Second Congressional Letter also criticizes "TRICARE's and its contractor's lax treatment of [] sensitive data."  It states that, "[w]ith SAIC's history of serious security failures, it is disturbing that TRICARE engaged this contractor for such sensitive work."

17.     The Second Congressional Letter specifically describes the Privacy Act as an "important statute[,]" that TRICARE violated.

18.     This Second Congressional Letter concludes by noting that TRICARE's efforts to mitigate the harm caused by the breach are wholly insufficient, stating that "[t]he men and women who serve our country deserve much better."

19.     Plaintiffs are concerned about their finances, credit, identities and PII/PHI and, as such, generally monitor their credit, monitor their financial accounts and/or carefully store and dispose of their PII/PHI and any other documents containing components of their PII/PHI.  Since the Data Breach, certain Plaintiffs have experienced identity theft,[2] identity fraud, medical fraud,[3] lost medical identities and records, fraudulent credit card activity, the opening or re-

---

[2] According to the United States Government Accounting Office (GAO), the terms "identity theft" or "identity fraud" are broad terms encompassing various types of criminal activities.  Identity theft occurs when PII/PHI is used to commit fraud or other crimes.  These crimes include, *inter alia,* credit card fraud, phone or utilities fraud, bank fraud and government fraud (theft of government services).

[3] Medical fraud (or medical identity theft) occurs when a person's personal information is used without authorization to obtain, or receive payment for, medical treatment, services or goods.  *See* www.ftc.gov/bcp/edu/microsites/idtheft/consumers/resolving-specific-id-theft-problems.html (last visited October 19, 2011).  For example, as of 2010, more than 50 million people in the United States did not have health insurance according to the U.S. census.  This, in turn has led to a surge in medical identity theft as a means of fraudulently

opening of new credit card accounts in their name, phishing[4] increased calls from telemarketers and/or increased mailers marketing products and services including, *inter alia,* medical products, medical services and/or prescription drugs specifically targeted at their medical conditions.

20.     Plaintiffs have standing because as a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiffs have incurred (and will continue to incur) damages in the form of, *inter alia,* (i) loss of privacy, (ii) out-of-pocket expenses to purchase credit monitoring, internet monitoring, identity theft insurance and/or other Data Breach risk mitigation products, (iii) out-of-pocket expenses incurred to mitigate the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (iv) the value of their time spent mitigating the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, and/or (v) the additional damages set forth in detail in Paragraphs 21-23, which are incorporated herein by reference.

21.     As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiffs and Class Members also have been deprived of the value of their PII/PHI, for which there is a well-established national and international market. For example, stolen PII/PHI is sold on the cyber black market for $14 to $25 per medical record

---

obtaining medical care. "Victims of medical identity theft [also] may find that their medical records are inaccurate, which can have a serious impact on their ability to obtain proper medical care and insurance benefits." *Id.*

[4] "Phishing" is an attempt to acquire information (and sometimes, indirectly, money), such as usernames, passwords and credit card details by masquerading as a trustworthy entity through an electronic communication. Communications purporting to be from popular social websites, auction sites, online payment processors or IT administrators are commonly used to lure the unsuspecting public. Phishing emails may contain links to websites that are infected with malware. Phishing is typically carried out by e-mail spoofing or instant messaging, and often directs users to enter details at a fake website that looks and feels almost identical to the legitimate one. When criminals have access to PII/PHI from a large group of similarly situated victims, it is much more feasible to develop a believable phishing spoof email that appears realistic. They can then get this group of victims to reveal additional private information, such as credit cards, bank accounts, and the like.

to (i) individuals needing or wanting a new identity or healthcare, or focused on committing fraud, (ii) medical service providers, medical device manufacturers and drug manufacturers for targeted marketing and advertising campaigns for their products and services, and (iii) health insurers for targeted marketing and advertising campaigns for their health insurance products and to monitor their insureds' medical conditions for purposes of adjusting their health insurance premiums.   These companies use Plaintiffs' and Class Members' own wrongfully disclosed PII/PHI to market medical products and services to Plaintiffs and Class Members and invade the privacy of Plaintiffs and Class Members to monitor their personal situations.

22.   Additionally, as a result of Defendants' failure to follow contractually-agreed upon, federally-prescribed, industry standard security procedures, numerous Plaintiffs and Class Members received a diminished value of the services they paid TRICARE to provide.   Upon information and belief, a portion of the health and dental insurance premiums paid by certain Plaintiffs and Class Members to TRICARE is for the provision of healthcare-related services, such as data management and data security.   The Plaintiffs and Class Members who purchased their health and dental insurance from TRICARE contracted for an insurance plan that included a guarantee by Defendants to safeguard and protect their PII/PHI, but instead, received a plan devoid of these important protections.   Despite failing to implement or inadequately implementing policies to safeguard and protect their PII/PHI, Defendants have the beneficial use and enjoyment of the full amount of the insurance premiums without providing the full complement of promised services.

23.   Defendants' wrongful actions and/or inaction and the resulting Data Breach have also placed Plaintiffs and Class Members at an imminent, immediate and continuing increased risk of identity theft, identity fraud and medical fraud.   Indeed, Javelin Strategy & Research ("Javelin"), a leading provider of quantitative and qualitative research, recently released its 2012 Identity Fraud Report ("the Javelin Report"), quantifying the impact of data breaches.

According to the Javelin Report, individuals whose PII/PHI is subject to a reported data breach—such as the Data Breach at issue here—are approximately 9.5 times more likely than the general public to suffer identity fraud and/or identity theft.  Moreover, there is a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported, and a high probability that criminals who may now possess Plaintiffs' and Class Members' PII/PHI and not yet used the information will do so at a later date or re-sell it.

24.     Accordingly, Plaintiffs and Class Members seek redress against Defendants for, *inter alia*, violations of the APA, the Privacy Act, FCRA, various common law torts, breach of a third party beneficiary contract, breach of an implied-in-fact contract, violations of various state consumer statutes, violations of certain other state statutes, including the California Confidentiality of Medical Information Act (California Civil Code § 56, *et seq.*), Tennessee Patients' Privacy Protection Act (T.C.A. § 68-11-1501, *et. seq.*), Oregon Protected Health Information Law (ORS § 192.553, *et seq.*), Oregon Consumer Identity Theft Protection Act (ORS § 646A.622), Virginia Health Records Privacy Act (Va. Code. Ann. § 32.1-127.1.1:03), wrongful disclosure of medical information, California's Security Requirements for Consumer Records (Cal. Civ. Code §§ 1798.29 and 1798.80, *et. seq.*), and unjust enrichment.

25.     Plaintiffs, therefore, on behalf of themselves and Class Members, seek (i) actual and other economic damages, nominal damages, statutory damages, liquidated damages and/or treble damages, (ii) punitive damages, (iii) injunctive relief, (iv) declaratory relief, and (v) attorneys' fees, litigation expenses and costs of suit.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over Plaintiffs' APA, FCRA and Privacy Act claims pursuant to 28 U.S.C. § 1331 (federal question).  This Court also has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 § 1332(d) (CAFA) because (a) there are

100 or more Class Members, (b) at least one Class Member is a citizen of a state that is diverse from SAIC's citizenship, and (c) the matter in controversy exceeds $5,000,000 USD exclusive of interest and costs. This Court also has subject matter jurisdiction over Plaintiffs' claims pursuant to 5 U.S.C. §§ 552a(g)(5) because this is a civil action to enforce a liability created under 5 U.S.C. § 552a after September 27, 1975. This Court also has subject matter jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

27.     This Court has personal jurisdiction over Defendants because at all relevant times, Defendants conducted (and continue to conduct) substantial business in the District of Columbia.

28.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 because all Defendants are subject to personal jurisdiction in the District of Columbia and a substantial part of the events or omissions giving rise to the claims occurred in this District of Columbia.

29.     Finally, the class action lawsuits referenced in the above caption were transferred to this Court per the June 12, 2012 Transfer Order of the Judicial Panel on Multi-District Litigation. Plaintiffs in the transferred actions reserve their right to remand these actions to the districts from which they were transferred at or before conclusion of the pre-trial proceedings.[5]

## **PARTIES**

30.     Plaintiff Thomas Adcock is a resident of Pensacola, Florida. Defendants possess Plaintiff Adcock's most sensitive personal and medical information (*i.e.,* his PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential. Plaintiff Adcock received a letter from SAIC confirming that his PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the world. As a direct and/or proximate

---

[5] *See Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).

result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Adcock has suffered economic damages and other actual harm.  Defendants' wrongful disclosure of Plaintiff Adcock's PII/PHI has also placed him at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

31.     Plaintiff Fernando Arellano is a member of the Army National Guard and a resident of Leander, Texas.  Defendants possess Plaintiff Arellano's most sensitive personal and medical information (*i.e.,* his PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential.  Plaintiff Arellano received a letter from SAIC confirming that his PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the world.  As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Arellano has suffered economic damages and other actual harm.  Defendants' wrongful disclosure of Plaintiff Arellano's PII/PHI has also placed him at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

32.     Plaintiff Michael Bacon is a resident of Lompoc, California.  Defendants possess Plaintiff Bacon's most sensitive personal and medical information (*i.e.,* his PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential.  Plaintiff Bacon received a letter from SAIC confirming that his PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the world.  As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Bacon has suffered economic damages and other actual harm.  Defendants' wrongful disclosure of

Plaintiff Bacon's PII/PHI has also placed him at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

33.     Plaintiff Donald J. Bates is a resident of Elyria, Ohio.  Defendants possess Plaintiff Bates' most sensitive personal and medical information (*i.e.,* his PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential.  Plaintiff Bates received a letter from SAIC confirming that his PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the world.  As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Bates has suffered economic damages and other actual harm.  Defendants' wrongful disclosure of Plaintiff Bates' PII/PHI has also placed him at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

34.     Plaintiff James Biggerman, Jr. is a resident of Shelbyville, Indiana, and a retired Sergeant Major with the United States Army. Defendants possess Plaintiff Biggerman's most sensitive personal and medical information (*i.e.,* his PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential.  Plaintiff Biggerman received a letter from SAIC confirming that his PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the world.  At all relevant times, Plaintiff Biggerman purchased medical and/or dental insurance from TRICARE.  As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Biggerman has suffered economic damages and other actual harm.  Defendants' wrongful

disclosure of Plaintiff Biggerman's PII/PHI has also placed him at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

35.     Plaintiff Robert Curtis is a resident of Monument, Colorado, and formerly served in the United States Navy and worked for the DOD.  His wife, Cathy Curtis, is retired from the United States Air Force.  Defendants possess Plaintiff Curtis' most sensitive personal and medical information (*i.e.,* his PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential.  Plaintiff Curtis received a letter from SAIC confirming that his PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the world.  After the Data Breach, an unknown individual used Plaintiff Curtis' identity to obtain loans for businesses, cancel and create credit cards, and destroy his credit history. Plaintiff Curtis' wife received a call from USAA (Bank) that an individual in Mexico had called USAA and knew Plaintiff Curtis' account number, telephone number, e-mail address, Social Security number and answers to the security questions. The individual claimed to be Plaintiff Curtis, and stated that his room had been robbed and he needed USAA to send him a card with $500 of emergency funds. The only information the individual did not have was Plaintiff Curtis' "phone password."  Plaintiff Curtis' wife informed USAA that Plaintiff Curtis was not in Mexico and did not authorize the requests. The individual called USAA back multiple times in an attempt to acquire money.  Plaintiff Curtis has also received letters in the mail from American Express thanking him for applying for loans about which he is not aware about which Plaintiff Curtis has contacted the credit bureaus.  Plaintiff Curtis has spent over 500 hours and $360 attempting to mitigate the potential impact of the Data Breach and all of his issues still are not resolved.  At all relevant times, Plaintiff Curtis purchased medical and/or dental insurance from

TRICARE.  As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Curtis has suffered economic damages and other actual harm.  Defendants' wrongful disclosure of Plaintiff Curtis' PII/PHI has also placed him at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

36.     Plaintiff Ella Deatrick is a resident of Sacramento, California, and the spouse of a retired United States Air Force Staff Sergeant.  Defendants possess Plaintiff Deatrick's most sensitive personal and medical information (*i.e.*, Her PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential.  Plaintiff Deatrick received a letter from SAIC confirming that her PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the world.   At all relevant times, Plaintiff Deatrick purchased medical and/or dental insurance from TRICARE.  As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Deatrick has suffered economic damages and other actual harm.  Defendants' wrongful disclosure of Plaintiff Deatrick's PII/PHI has also placed her at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

37.     Plaintiff Michael Erickson is retired from the United States Marine Corps and a resident of Alexandria, Virginia.  Defendants possess Plaintiff Erickson's most sensitive personal and medical information (*i.e.,* his PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential.  Plaintiff Erickson received a letter from SAIC confirming that his PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011,

and exposed to the world.  After the Data Breach, Plaintiff Erickson, who has resided in Japan and regularly travels to Japan on business, was forced to cancel all of his Japan-based credit cards, withdraw all of his Japanese Yen-based and Dollar-based funds and close all of his overseas bank accounts for his family and his business. This had to be performed in-person at the banking institutions in Tokyo because Japanese banks do not allow the closing of accounts without physically surrendering the corresponding bank cards and bank books, which required Plaintiff Erickson to travel to Tokyo at his personal expense.  As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Erickson has suffered economic damages and other actual harm.  Defendants' wrongful disclosure of Plaintiff Erickson's PII/PHI has also placed him and his family at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

38.     Plaintiff Virginia Gaffney is a resident of Hampton, Virginia, and the spouse of a decorated war veteran.  Plaintiff Gaffney brings this action on behalf of herself and her minor children whose PII/PHI also was compromised in the Data Breach.  Defendants possess Plaintiff Gaffney's family's most sensitive personal and medical information (*i.e.*, their PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential. Plaintiff Gaffney received letters from SAIC confirming that her PII/PHI and her children's PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the world. Plaintiff Gaffney holds credit cards through USAA bank, which serves millions of military veterans and family members.  Shortly after the Data Breach, USAA cancelled one of Plaintiff Gaffney's credit cards based on allegedly "suspicious activity."  Plaintiff Gaffney also purchased a credit and personal identity monitoring service.  As a direct and/or proximate result of

Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Gaffney has suffered economic damages and other actual harm.  Defendants' wrongful disclosure of Plaintiff Gaffney's PII/PHI and her children's PII/PHI has also placed her and her family at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

39.     Plaintiff Shanna Hartman is a resident of Seal Beach, California, and the spouse of a highly decorated Senior Chief in the United States Navy who served in various combat zones.  Defendants possess Plaintiff Hartman's most sensitive personal and medical information (*i.e.,* her PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential. Plaintiff Hartman received a letter from SAIC confirming that her PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the world. At all relevant times, Plaintiff Hartman purchased medical and/or dental insurance from TRICARE. As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Hartman has suffered economic damages and other actual harm. Defendants' wrongful disclosure of Plaintiff Hartman's PII/PHI has also placed her at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

40.     Plaintiff Jeff Hawk is in the United States Army and a resident of Fort Drum, New York and a member of the United States Army.  Defendants possess Plaintiff Hawk's most sensitive personal and medical information (*i.e.,* his PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential. Plaintiff Hawk received a letter from SAIC confirming that his PII/PHI was contained on the unprotected backup data tapes taken from the

SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the world.  After the Data Breach, one of Plaintiff Hawk's closed department store credit cards was reopened and used, which resulted in approximately $500 of fraudulent charges.  Plaintiff Hawk spent several hours on the telephone rectifying the situation.  As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Hawk has suffered economic damages and other actual harm.  Defendants' wrongful disclosure of Plaintiff Hawk's PII/PHI has also placed him at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

41.     Plaintiff Juan Diego Hernandez is a resident of Frisco, Texas and retired from serving in the United States Army. Defendants possess Plaintiff Hernandez's most sensitive personal and medical information (*i.e.,* his PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential. Plaintiff Hernandez received a letter from SAIC confirming that his PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the world.  Since the Data Breach, Plaintiff Hernandez noticed fraudulent charges on a credit card account he holds with his spouse.  Plaintiff Hernandez spent several hours calling the bank and providing information to remedy the fraudulent charges.  As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Hernandez has suffered economic damages and other actual harm.  Defendants' wrongful disclosure of Plaintiff Hernandez's PII/PHI has also placed him at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

17

42.     Plaintiff Val Johnson is a resident of Anacortes, Washington and retired from serving in the United States Air Force.  Defendants possess Plaintiff Johnson's most sensitive personal and medical information (*i.e.,* his PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential. Plaintiff Johnson received a letter from SAIC confirming that her PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the world.  As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Johnson has suffered economic damages and other actual harm.  Defendants' wrongful disclosure of Plaintiff Johnson's PII/PHI has also placed him at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

43.     Plaintiff Carol Keller is a resident of Revere, Massachusetts and married to a retired disabled veteran of the United States Air Force.  Defendants possess Plaintiff Keller's most sensitive personal and medical information (*i.e.,* her PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential. Plaintiff Keller received a letter from SAIC confirming that her PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the world. Since the Data Breach, Plaintiff Keller has discovered three separate instances of fraudulent charges on her debit card and bank accounts – one in October 2011, one in December 2011, and one in January 2012.  Plaintiff Keller and her husband have spent many hours remedying these fraudulent charges and communicating with her debit card bank issuers.  As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Keller has suffered economic damages

and other actual harm.  Defendants' wrongful disclosure of Plaintiff Keller's PII/PHI has also placed her at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

44.     Plaintiff Mark Losack is a resident of San Diego, California and a retired Colonel in the United States Marine Corps.  Defendants possess Plaintiff Losack's most sensitive personal and medical information (*i.e.,* his PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential. Plaintiff Losack received a letter from SAIC confirming that his PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the world.  Since the Data Breach, Plaintiff Losack has spent approximately five hours monitoring for instances of fraudulent charges on his debit card and bank accounts.  As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Losack has suffered economic damages and other actual harm. Defendants' wrongful disclosure of Plaintiff Losack's PII/PHI has also placed him at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

45.     Plaintiff Theodore Martin is a resident of Lyman, South Carolina, and retired from the United States Army because of injuries he received while on active duty.  Defendants possess Plaintiff Martin's most sensitive personal and medical information (*i.e.,* his PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential. Plaintiff Martin received a letter from SAIC confirming that his PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the world, which he

learned about while recovering from his injuries, thereby making a stressful situation even more stressful.  As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Martin has suffered economic damages and other actual harm.  Defendants' wrongful disclosure of Plaintiff Martin's PII/PHI has also placed him at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

46.     Plaintiff Susie Moss-McUmber is a resident of Pleasant View, Tennessee. Defendants possess Plaintiff Moss-McUmber's most sensitive personal and medical information (*i.e.,* his PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential. Plaintiff Moss-McUmber received a letter from SAIC confirming that her PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the world.  As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Moss-McUmber has suffered economic damages and other actual harm.  Defendants' wrongful disclosure of Plaintiff Moss-McUmber's PII/PHI has also placed her at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

47.     Plaintiff Benny Miller is a resident of Fort Leonard Wood, Missouri, and on active duty with the United States Army. Defendants possess Plaintiff Miller's most sensitive personal and medical information (*i.e.,* his PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential.  Plaintiff Miller received a letter from SAIC confirming that his PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011,

and exposed to the world.  As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Miller has suffered economic damages and other actual harm.  Defendants' wrongful disclosure of Plaintiff Miller's PII/PHI has also placed him at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

48.     Plaintiff Antonette Morelli is a resident of San Antonio, Texas, a United States Air Force veteran and the spouse of a retired Air Force Colonel.  Plaintiff Morelli was wounded during active duty service and is a disabled veteran.  Defendants possess Plaintiff Morelli's most sensitive personal and medical information (*i.e.,* her PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential. Plaintiff Morelli received a letter from SAIC confirming that her PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the world.  Since the Data Breach, Plaintiff Morelli and her spouse have experienced unauthorized charges on two credit cards and unauthorized withdrawals from two bank accounts.  In response to notifications received after the Data Breach that certain financial accounts had been compromised, Plaintiff Morelli and her husband (i) cancelled credit cards and closed bank accounts, (ii) opened new credit card accounts and bank accounts, (iii) stopped direct deposits to the closed compromised accounts, (iv) re-enrolled direct deposits for the new accounts, (v) stopped recurring electronic payments made from the compromised accounts, and (vi) re-enrolled electronic payments through new accounts.  Plaintiff Morelli also purchased a credit and personal identity monitoring service.  As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Morelli has suffered economic damages and other actual harm.  Defendants' wrongful disclosure of

Plaintiff Morelli's PII/PHI has also placed her at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

49. Plaintiff Murry Moskowitz is a resident of Burke, Virginia and a retired Air Force Major. Defendants possess Plaintiff Moskowitz's most sensitive personal and medical information (*i.e.,* his PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential. Plaintiff Moskowitz received a letter from SAIC confirming that his PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the world. Since the Data Breach, Plaintiff Moskowitz has received a number of unsolicited calls from telemarketers and scam artists. Plaintiff Moskowitz has been inconvenienced by these unwanted calls. As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Moskowitz has suffered economic damages and other actual harm. Defendants' wrongful disclosure of Plaintiff Moskowitz's PII/PHI has also placed him at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

50. Plaintiff Alfred Newman is a resident of Germantown, Maryland. Plaintiff Newman recently retired from the United States Army due to an injury sustained on active duty in Iraq. Defendants possess Plaintiff Newman's most sensitive personal and medical information (*i.e.,* his PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential. Plaintiff Newman received a letter from SAIC confirming that his PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the world. As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting

Data Breach, Plaintiff Newman has suffered economic damages and other actual harm. Defendants' wrongful disclosure of Plaintiff Newman's PII/PHI has also placed him at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

51.     Plaintiff Colleen O'Hara-Epperly is a resident of Pocatello, Idaho.  Defendants possess Plaintiff O'Hara-Epperly's most sensitive personal and medical information (*i.e.,* her PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential. Plaintiff O'Hara-Epperly received a letter from SAIC confirming that her PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the world.  As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff O'Hara-Epperly has suffered economic damages and other actual harm. Defendants' wrongful disclosure of Plaintiff O'Hara-Epperly's PII/PHI has also placed her at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

52.     Plaintiff Jessica Palmer is a resident of San Antonio, Texas and the spouse of an United States Air Force officer.  Plaintiff Palmer brings this action on behalf of herself and her minor children whose PII/PHI also was compromised in the Data Breach.  Defendants possess Plaintiff Palmer's family's most sensitive personal and medical information (*i.e*., their PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential. Plaintiff Palmer received letters from SAIC confirming that her PII/PHI and her children's PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the

world.  Since the Data Breach, Plaintiff Palmer and her husband have purchased a credit and personal identity monitoring service on their behalf and on behalf of their children.  As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Palmer has suffered economic damages and other actual harm.  Defendants' wrongful disclosure of Plaintiff Palmer's PII/PHI has also placed her at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

53.     Plaintiff Amandah Peting is a resident of Winston-Salem, North Carolina, whose spouse formerly served in the United States Army.  Defendants possess Plaintiff Peting's most sensitive personal and medical information (*i.e*., her PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential. Plaintiff Peting received a letter from SAIC confirming that her PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the world.   As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Peting has suffered economic damages and other actual harm.  Defendants' wrongful disclosure of Plaintiff Peting's PII/PHI has also placed her at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and/or medical fraud.

54.     Plaintiff Jennifer Pineirovigo is a resident of Gulfport, Mississippi, whose spouse is on active duty with the United States Navy.  Defendants possess Plaintiff Pineirovigo's most sensitive personal and medical information (*i.e*., her PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential. Plaintiff Pineirovigo received a letter from SAIC confirming that her PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about

September 12, 2011, and exposed to the world.   As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Pineirovigo has suffered economic damages and other actual harm.   Defendants' wrongful disclosure of Plaintiff Pineirovigo's PII/PHI has also placed her at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

55.   Plaintiff Nia Reznikov is a resident of Honolulu, Hawaii, whose spouse is retired from the United States Air Force.   Defendants possess Plaintiff Reznikov's most sensitive personal and medical information (*i.e.*, her PII/PHI which, pursuant to federal law, Defendants are required to keep confidential. Plaintiff Reznikov received a letter from SAIC confirming that her PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the world.   At all relevant times, Plaintiff Reznikov purchased medical and/or dental insurance from TRICARE. As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Reznikov has suffered economic damages and other actual harm.   Defendants' wrongful disclosure of Plaintiff Reznikov's PII/PHI has also placed her at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

56.   Plaintiff Allie J. Richardson, III is a resident of Louisville, Kentucky.  Defendants possess Plaintiff Richardson's most sensitive personal and medical information (*i.e.*, his PII/PHI), as well as his wife's PII/PHI, which, pursuant to federal law, Defendants are required to keep confidential. Plaintiff Richardson received a letter from SAIC confirming that his PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011,

and exposed to the world.  After the Data Breach, Plaintiff Richardson purchased credit and personal identity monitoring services for himself and his wife, and thus has suffered economic loss in a minimum amount at least equal to the cost of the monitoring services (*i.e.*, $25 per month).  At all relevant times, Plaintiff Richardson purchased medical and/or dental insurance from TRICARE.  As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Richardson has suffered economic damages and other actual harm.  Defendants' wrongful disclosure of Plaintiff Richardson's PII/PHI has also placed him at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

57.     Plaintiff Kyle Roe is a resident of Redmond, Oregon, and currently serving in the Army National Guard.  Defendants possess Plaintiff Roe's most sensitive personal and medical information (*i.e.*, his PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential. Plaintiff Roe received a letter from SAIC confirming that his PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the world.  As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Roe has suffered economic damages and other actual harm. Defendants' wrongful disclosure of Plaintiff Roe's PII/PHI has also placed him at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

58.     Plaintiff Cecil Trower is a resident of Oklahoma City, Oklahoma.  Defendants possess Plaintiff Trower's most sensitive personal and medical information (*i.e.*, his PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential. Plaintiff Trower

received a letter from SAIC confirming that his PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the world.  As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Trower has suffered economic damages and other actual harm.  Defendants' wrongful disclosure of Plaintiff Trower's PII/PHI has also placed him at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

59.     Plaintiff Matthew Walters is a resident of Brooksville, Florida, and retired from the United States Air Force.  Defendants possess Plaintiff Walter's most sensitive personal and medical information (*i.e.*, his PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential. Plaintiff Walters received a letter from SAIC confirming that his PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the world.  After the Data Breach, Plaintiff Walters purchased a credit monitoring program.  As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Walters has suffered economic damages and other actual harm.  Defendants' wrongful disclosure of Plaintiff Walters' PII/PHI has also placed him at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

60.     Plaintiff Robin Warner is a resident of White Lake, Michigan, whose spouse is retired from the United States Army.  Defendants possess Plaintiff Warner's most sensitive personal and medical information (*i.e.*, his PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential. Plaintiff Warner received a letter from SAIC confirming that

her PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the world.  Since the Data Breach, Plaintiff Warner has experienced medical fraud in that her medical identity and medical records no longer exist. As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Warner has suffered economic damages and other actual harm. Defendants' wrongful disclosure of Plaintiff Warner's PII/PHI has also placed her at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and/or medical fraud.

61.     Plaintiff Celia Worrell is a resident of Hartselle, Alabama, whose spouse was formerly in the United States Army.  Defendants possess Plaintiff Worrell's most sensitive personal and medical information (*i.e.*, her PII/PHI) which, pursuant to federal law, Defendants are required to keep confidential. Plaintiff Worrell received a letter from SAIC confirming that her PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the world.  At all relevant times, Plaintiff Worrell purchased medical and/or dental insurance from TRICARE.   As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Worrell has suffered economic damages and other actual harm.  Defendants' wrongful disclosure of Plaintiff Worrell's PII/PHI has also placed her at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

62.     Plaintiff Dorothy Yarde is a resident of Evans, Georgia.  Defendants possess Plaintiff Yarde's most sensitive personal and medical information (*i.e.*, her PII/PHI) which,

pursuant to federal law, Defendants are required to keep confidential. Plaintiff Yarde received a letter from SAIC confirming that her PII/PHI was contained on the unprotected backup data tapes taken from the SAIC employee's unattended personal vehicle in downtown San Antonio, Texas, on or about September 12, 2011, and exposed to the world.  Plaintiff Yarde's telephone number is unlisted.  After the Data Breach, she received numerous unsolicited telephone calls from insurance companies and other medical products and services telemarketers targeted at a specific medical condition listed in her medical records—which Plaintiff Yarde never received before the Data Breach.  Plaintiff Yarde also has been victimized by heightened phishing from insurance companies and credit card companies, which has inconvenienced her.  Plaintiff Yarde also historically has used a post office box to receive her bills and other correspondence instead of her home address because she works overseas and did not want any mail delivered to her home address.  However, since the Data Breach, she regularly receives solicitation mail from medical, auto and life insurance companies and credit card companies.  At all relevant times, Plaintiff Yarde also purchased medical and/or dental insurance from TRICARE.  As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff Yarde has suffered economic damages and other actual harm.  Defendants' wrongful disclosure of Plaintiff Yarde's PII/PHI has also placed her at an imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and medical fraud.

63.    Defendant TRICARE is an agency within the Military Health System, the fully integrated healthcare system of the DOD and, therefore, is an "agency" for purposes of the Privacy Act.  TRICARE provides health-care coverage for medical services, medications and dental care for current and former military personnel, their families and their survivors.  At all

relevant times, TRICARE was (and continues to be) entrusted with, and obligated to protect, Plaintiffs' and Class Members' PII/PHI, as well as the PII/PHI of their families.

64.     Defendant DOD is an executive department of the federal government and, therefore, is an "agency" for purposes of the Privacy Act.  Defendant DOD, among other things, provides medical and dental care, medical and dental products and services and medications to Plaintiffs and Class Members.  At all relevant times, DOD was (and continues to be) entrusted with, and obligated to protect, Plaintiffs' and Class Members' PII/PHI, as well as the PII/PHI of their families.

65.     Defendant Panetta, in his Official Capacity as Secretary of the DOD, is the official responsible for the proper execution and administration of all laws administered by the DOD, as well as for the control, direction and management of the DOD.

66.     Defendants TRICARE, DOD and Panetta hereafter collectively may be referred to as the "Government Defendants."

67.     Defendant SAIC is a Delaware corporation with its principal place of business in McLean, Virginia.  SAIC has additional offices throughout the United States.  SAIC is a FORTUNE 500 company that provides, among other services, electronic information management services and/or cyber security services to DOD and its agencies—such as TRICARE, the health care program serving current and former uniformed service members, retirees and their families worldwide.  At all relevant times, SAIC provided electronic information management services and/or cyber security services to TRICARE at various San Antonio area military medical treatment facilities in connection with the provision of medical treatment and/or medical services to Plaintiffs and Class Members in consumer transactions during the Class Period—to wit, in order to receive health care coverage, medical and dental

care, medical and dental products and services and/or medications, Plaintiffs and Class Members were required to provide their PII/PHI to SAIC, as well as the other Defendants.  At all relevant times, SAIC, as well as the other Defendants, was (and continues to be) entrusted with, and obligated to protect, Plaintiffs' and Class Members' PII/PHI, as well as the PII/PHI of their families.  SAIC is a wholly-owned subsidiary of SAIC, Inc., a publicly traded company (SAI; NYSE) with 2012 revenue of over $10.5 billion.  During the last three fiscal years, SAIC has derived a substantial amount of its revenues from government contracts, receiving over $20 billion of revenue from DOD alone.

68.   Defendant SAIC is a Consumer Reporting Agency as defined under the FCRA because SAIC regularly engages, in whole or in part, in the practice of assembling information on consumers for the purpose of furnishing consumer reports to third parties and/or uses interstate commerce for the purpose of preparing and/or furnishing consumer reports.

## SUBSTANTIVE ALLEGATIONS

**A.    Factual Background**

69.   As an agency within the Military Health System of the DOD, TRICARE manages a fully integrated health care system that provides health care coverage, prescription services, and dental care for current and former military personnel, their families and anyone else entitled to health benefits from the DOD since February 1998.  In doing so, TRICARE and DOD are entrusted with and obligated to protect the PII/PHI of TRICARE beneficiaries—including the PII/PHI of Plaintiffs, Class Members and their families.

70.   TRICARE manages health coverage for approximately 9 million individuals and is organized into three regions:  North, South, and West.  Each region contains approximately 3 million beneficiaries.

71.     TRICARE and DOD are legally obligated to protect and maintain the confidentiality and privacy of PII/PHI in accordance with all applicable laws.   As such, TRICARE and DOD are responsible for contracting with appropriate third party vendors that will be entrusted with PII/PHI to make sure that such vendors also maintain the confidentiality and privacy of PII/PHI according to these standards.

72.     Indeed, in marketing to Plaintiffs, TRICARE pledges to maintain the privacy of its members' PII/PHI pursuant to its obligations under federal law, including the Health Information Portability and Accountability Act ("HIPAA").  *See* TRICARE's Privacy and Civil Liberties Office notice, *available at:* http://www.tricare.mil/tma/privacy (promising "compliance with federal privacy and security laws, and DOD regulations and guidelines . . .").

73.     HIPAA's Security Rules set out a list of business processes and technical requirements that TRICARE must follow to ensure the security of private healthcare information, including (i) administrative safeguards to manage security measures and conduct of personnel that access, view, process and distribute electronic protected health information, (ii) physical safeguards which includes protecting physical equipment and related buildings from physical intrusions, and (iii) technical safeguards which includes protecting, controlling and monitoring access to information. *See* TRICARE's HIPAA and Privacy notice, *available at*: http://www.tricare.mil/mybenefit/home/Medical/RecordsAndPrivacy/HIPAAPrivacy?

74.     In addition, the Health Information Technology for Economic and Clinical Health Act (HITECH), part of the 2009 American Recovery and Reinvestment Act, requires healthcare organizations to ensure that patient information in health records is unusable, unreadable, or indecipherable to unauthorized individuals.

75.      In August 2009, the U.S. Department of Health and Human Services (HHS) published an interim final rule requiring either encryption or destruction to ensure the security of health records. The National Institute of Standards and Technology developed that rule and created guidelines that require federal agencies to encrypt data using the Advanced Encryption Standard, which was adopted as a federal standard in 2002.[6]

76.      Additionally, DOD purports to have medical records safeguards in place at all military treatment facilities to ensure the safety and confidentiality of members' records including educating staff about their responsibility of  the records, periodic records audits, designating privacy officers to ensure healthcare information remains private. *See* TRICARE's Medical      Records      at      Military      Treatment      Facilities,      *available      at*: http://www.tricare.mil/mybenefit/home/Medical/RecordsAndPrivacy/MedicalTreamentFacilitie?

77.      TRICARE also expressly states on its website and handbooks for the Tricare Prime, Tricare for Life, Tricare Prime Overseas, Tricare Prime Remote Overseas, Tricare Standard and Extra health insurance plans that as TRICARE beneficiaries, Plaintiffs and Class Members should expect the following:

> **Confidentiality of health information:** You should expect to communicate with health care providers in confidence and to have the confidentiality of your health care information protected to the extent permitted by law. You also should expect to have the ability to review, copy, and request amendments to your medical records.

*See* TRICARE's Expectations for Beneficiaries, *available at*:

http://www.humana-military.com/library/pdf/tricare-expectations-for-beneficiaries.pdf.

---

[6] The interim rule is at: http://www.gpo.gov/fdsys/pkg/FR-2009-08-24/pdf/E9-20169.pdf .

78.     Upon information and belief, a portion of the medical and/or dental insurance premiums paid by Plaintiffs and Class Members to TRICARE goes to health related services, such as safeguarding and protecting the confidentiality of their PII/PHI.

79.     In 1992, TRICARE and DOD first contracted with SAIC to perform certain services.  As part of the business relationship, SAIC was obligated to safeguard and protect PII/PHI received by TRICARE and DOD and entrusted to SAIC—including Plaintiffs' and Class Members' PII/PHI.  As a government contractor with TRICARE and DOD, SAIC has a duty to ensure the confidentiality and privacy of PII/PHI in accordance with the Privacy Act and APA.

80.     SAIC's website, in fact, boasts that it "preserv[es] confidentiality, data integrity, and service availability."  SAIC Security and Privacy, *available at*: http://www.saic.com/health/healthit/security-privacy.html.

81.     Pursuant to the 2004 contract between SAIC and the Government Defendants (which was renewed in 2005 and 2006), the PII/PHI of Plaintiffs and Class Members, all of whom are third-party beneficiaries of the contract, is to be protected and kept confidential and private.  Upon information and belief, the standard remains the same:

**6.0  Other Terms, Conditions, and Provisions**.

**Proprietary Information Statement**

The Contractor [SAIC] shall sign one version of the following non-disclosure statement on behalf of the company, only if applicable, and shall also ensure that all staff assigned to, including all subcontractors and consultants, performing on this Delivery Order execute and adhere to the terms of the following non-disclosure statement, protecting the procurement sensitive information of the Government and the proprietary information of other contractors (Deliverable 1).  Assignment of staff who have not executed this statement or failure to adhere to this statement shall continue default on the part of the Contractor.

*Id*. at 18.

**Policy for Information Assurance**

**General Security Requirements**.   The Contractor [SAIC] shall establish appropriate administrative, technical and physical safeguards to protect any and all Government data, to ensure the confidentiality, integrity, and availability of government data.  As a minimum, this shall include provisions for personnel security, electronic security and physical security as listed in the sections that follow:

> Health Insurance Portability and Accountability Act (HIPAA) **The Contractor shall comply with the Health Insurance Portability and Accountability Act of 1996 (HIPAA) (P.L.104-191) requirements, specifically the administrative simplification provisions of the law and the associated rules and regulations published by the Secretary, Health and Human Services (HHS) and the published TRICARE Management Activity (TMA) implementation directions. This includes the Standards for Electronic Transactions and the Standards for Privacy of Individually Identifiable Health Information. It is expected that the contractor shall comply with all HIPAA-related rules and regulations as they are published and as TMA requirements are defined (including security standards, identifiers for providers, employers, health plans, and individuals, and standards for claims attachment transactions).**

*Id*. at 23 (emphasis added).

**Special Requirements for Protected Health Information**. Whenever a contract is awarded that will collect, use or store Protected Health Information (PHI) then the contractors must notify the TMA Privacy Office when the contract is awarded. The Contractor shall ensure that data from any DoD AIS which contains PHI is continuously protected from unauthorized access, use, modification, or disclosure. The Contractor shall comply with DoD Directive 8500.1, Information Assurance, Privacy Act Program Requirements (DoD 5400.11), DoD Health Information Privacy Regulation (DoD 6025.18-R) and Personnel Security Program Requirements (5200.2-R).

*Id*. at 28.

**In addition, the Contractor shall employ physical security safeguards for IS/Networks involved in processing or storage of PHI to prevent the unauthorized access, disclosure, modification, destruction, use, etc., and to otherwise protect the confidentiality and ensure use conforms to the terms of an approved DUA.**

*Id*. at 29-30 (emphasis added).

82.     On May 19, 2011, SAIC announced that it was awarded a prime contract by DOD to provide information technology services and electronic health records system support to TRICARE.  The contract provides for three one-year options pursuant to which DOD will pay SAIC a total of $53 million if all options are exercised.

83.     On or about February 6, 2012, DOD extended the sole-source contract with SAIC to continue the very same duties which, as evidenced by the Data Breach and other security breaches discussed more fully herein, SAIC has repeatedly failed to adequately perform. NextGov, a website that monitors technology and government, describes the absurdity of this extension:

> File this one under irony.  Science Applications International Corp., the outfit that jeopardized the health care records of 4.9 million TRICARE beneficiaries when computer tapes containing the data were stolen from an employee's car, just received a sole-source contract to continue supporting the Defense Department core electronic health record system. . . .  What is unusual is there is no time line and no value given for this extension, a rather glaring omission considering SAIC's poor stewardship of records.

*See*       SAIC       Wins       More       TRICARE       Business,       *available*       *at*: http://whatsbrewin.nextgov.com/2012/02/saic_wins_more_tricare_business.php.       Absent litigation, Defendants will continue to fail to safeguard and protect the PII/PHI of servicemen and women and their families in perpetuity—including Plaintiffs' and Class Members' PII/PHI.

**B.     DOD and SAIC Knew the DOD's Information Security Systems Were Not Secure**

84.     In order to safeguard and protect PII/PHI received and maintained by the federal government, the GAO and the Federal Information Security Management Act ("FISMA") require each federal agency, including DOD, to submit a report addressing the agency's risk-based approach to agency-wide information security management.  The GAO then releases annual scorecards based on the agencies' FISMA reports.

85.     In March 2006, the 2005 FISMA grades were released.  The DOD received a grade of "F," the same grade received by DOD in 2001 and 2002 and down from the FISMA grade of "D" the DOD received in 2004.  *See* March 16, 2006 FISMA Computer Security Report Card.  The March 16, 2006 FISMA Report noted that "[o]ur analysis reveals that the scores for the Departments of Defense . . . remained unacceptably low or dropped precipitously. . . .  If FISMA was the No Child Left Behind Act, a lot of the critical agencies [including the DOD] would be on the list of 'low performers.'  None of us would accept D+ grades on our children's report cards.  We can't accept these either."   Several "areas of concern" for FISMA included "specialized security training for employees with significant security responsibilities" and "agency responsibility for contractors systems."  *Id.*

## C.     SAIC's Prior Security Failures and Data Breaches

86.     Since 2005, SAIC has experienced multiple data security failures due to malware infections, stolen computers and, in 2011, the Data Beach at issue here.

87.     For example, on February 12, 2005, SAIC notified 45,000 past and present employees – including top military and intelligence officials – that they were at risk of identity theft after computers containing Social Security numbers, financial transaction records and other sensitive personal information were stolen during a break-in at SAIC's administration building in San Diego, California.

88.     On July 20, 2007, SAIC announced that the Social Security numbers and personal health records of nearly 900,000 servicemen and women, their family members and other government employees – stored on a non-secure computer server – were compromised because SAIC failed to encrypt the data before transmitting it online.  Then CEO and current SAIC Chairman, Ken C. Dahlberg, described the 2007 security breach as "completely unacceptable."

89.     On January 1, 2008, SAIC notified the Massachusetts Office of the Attorney General that malware had infected a company computer that resulted in credit card information of certain customers being compromised.

90.     For example, on June 30, 2010, SAIC notified the Maryland Office of the Attorney General that it had discovered a theft of backup data tapes exposing sensitive private information, including Social Security numbers, to the world.

91.     SAIC's systemic pattern of security failures and data breaches, exacerbated by DOD's consistently failing FISMA grades, demonstrates SAIC's inability, unwillingness and failure to correct its faulty data protection policies.   SAIC's pattern of willful and intentional disregard for the security of the data in its possession and under its control continues although SAIC has received repeated warnings and suffered repeated embarrassments.   Such conduct is especially troubling considering that SAIC is obligated to protect the PII/PHI of servicemen and women, retirees and their families entrusted to it by TRICARE and DOD.

92.     Equally as troubling is the fact that although SAIC continually fails to properly perform its statutory and contractual duties to safeguard and protect PII/PHI entrusted to it— including Plaintiffs' and Class Members' PII/PHI—DOD has repeatedly rewarded SAIC with multi-hundred million dollar contracts to provide information technology services and electronic health record system support services.

**D.     Defendants' Latest Security Breach & Wrongful Disclosure**

93.     On September 29, 2011, TRICARE released a statement on its website concerning a security breach (the "September 29 Notification").   According to the September 29 Notification, more than two weeks prior, on September 14, 2011, TRICARE learned that on September 12, 2011, SAIC had experienced a security breach affecting over 4.7 million

TRICARE beneficiaries (*i.e.*, Plaintiffs and Class Members) who had received medical care or had laboratory work processed through military medical facilities in San Antonio, Texas since 1992 (*i.e.*, the Data Breach or Disclosure).

94.     TRICARE stated that the Data Breach resulted in the disclosure of computer data tapes containing PII/PHI—including Social Security numbers, addresses, phone numbers, dates of birth, and private medical information such as clinical notes, lab tests, prescription information and private health information for patients located nationwide and overseas.

95.      Only a portion of the PII/PHI on the data tapes was encrypted, and even then, the level of encryption failed to comply with government standards for strength of cryptographic modules.  At the time of the Data Breach, SAIC did not have a policy mandating that PII/PHI contained on backup data tapes be encrypted in accordance with federal standards.

96.     The September 29 Notification provided scant details of the types of data taken and vague descriptions of the persons affected.  In refusing to elaborate further, TRICARE explained that "this data loss remains the subject of an ongoing investigation" and that TRICARE "did not want to raise undue alarm in [its] beneficiaries and so wanted to determine the degree of risk this data loss represented before making notifications."

97.     On or about September 29, 2011, Vernon Guidry ("Guidry"), an SAIC spokesman, confirmed that SAIC, a TRICARE third-party contractor, was the custodian of the PII/PHI when the Data Breach occurred.

98.     TRICARE, through Guidry, confirmed that the unencrypted backup data tapes were being transported "pursuant to contract requirements" with SAIC when the Data Breach occurred.

99.    Specifically, on or about September 12, 2011, the backup data tapes, which were being transported by a low level SAIC employee in his personal vehicle, a 2003 Honda Civic, were left unattended in the vehicle for most of the day, from approximately 7:53 a.m. to 4:30 p.m., in the parking garage of an upscale office building in downtown San Antonio.

100.    A thief or thieves stealthily broke into the SAIC employee's vehicle and took the unencrypted backup data tapes, thereby gaining information worth millions of dollars.

101.    The parking garage where the Data Breach took place contained many cars that were far more valuable than the 2003 Honda Civic.  Yet the thief or thieves did not break into any of the luxury cars in the garage, instead targeting the relatively inexpensive car containing the data tapes.

102.    Upon information and belief, prior to entrusting the employee with transporting the data tapes, SAIC did not perform a background security check on the employee, nor train the employee in data security procedures as mandated by federal law.

103.    SAIC subsequently placed the employee entrusted to transport the backup data tapes on administrative leave.  According to Guidry, "it was his job to transfer tapes in an expeditious manner between facilities; that's all we're going to say at this point."  Although Guidry did not state whether the employee violated an internal policy by leaving the data tapes in his car, he acknowledged, "if they weren't in his car, they wouldn't be stolen."

104.    According to Sean Glynn, marketing vice president for Credant Technologies, a data security firm in Addison, Texas, an armored car should be used to transport large amounts of sensitive data—such as Plaintiffs' and Class Members' PII/PHI.

105.    Equally as important, Plaintiffs' and Class Members' PII/PHI contained on the tapes was either unencrypted or partially encrypted—but not pursuant to federal standards.

SAIC stated that the computer system that generated the data tapes is incapable of encrypting the tapes pursuant to federal standards.

106.    TRICARE's Operations Manual sets forth numerous regulations with which TRICARE does not comply, including, *inter alia,* that TRICARE will "adopt industry best practices of [electronic personal health information] technologies and management."

107.    On information and belief, Defendants' policy failures include routinely (i) failing to properly encrypt data tapes and other electronic data, (ii) providing unverified, untrained and/or improperly trained individuals with access to its members' PII/PHI, and (iii) allowing unverified, untrained and/or improperly trained individuals to remove such PII/PHI from Defendants' premises and transport such PII/PHI in their unarmored personal vehicles without the protection of an armed guard and/or other security precautions mandated by law.

108.    Defendants knew about their policy failures as early as March 2006 when the GAO gave the DOD a FISMA grade of "F" and noted several "areas of concern" for DOD— including the need for "specialized security training for employees with significant security responsibilities" and "agency responsibility for contractors systems."   Nevertheless, DOD has repeatedly renewed SAIC's contract while, at the same time, Defendants have failed and refused to remedy their failure to safeguard and protect PII/PHI.

109.    The Data Breach was a direct and/or proximate result of Defendants' ongoing failure to implement and maintain (as well as require its third party administrator to implement and maintain) appropriate and reasonable security procedures and practices to safeguard and protect Plaintiffs' and Class Members' PII/PHI from unauthorized access, destruction, use, modification and/or disclosure, as required by various state regulations and industry practices including.  Defendants' failures include, *inter alia*:

(a) the failure to implement and maintain written policies and procedures that clearly identify the employees or classes of employees with authorized access to PII/PHI;

(b) the failure to implement and maintain written policies and procedures to ensure that access to equipment containing PII/PHI is controlled and monitored;

(c) the failure to implement and maintain written policies and procedures to ensure that individuals with access to hardware and software containing PII/PHI provide authorization and are authenticated prior to gaining access to the PII/PHI;

(d) the failure to implement and maintain written policies and procedures that require contractors or agents to be trained on physical access responsibilities;

(e) the failure to implement and maintain written procedures for the security of facilities housing PII/PHI, including proper surveillance, entry control, maintenance records and visitor sign-in and escorts;

(f) the failure to implement and maintain written policies and procedures to ensure that information systems utilize encryption for both open and closed systems/networks;

(g) the failure to implement and maintain written policies and procedures to ensure data integrity of PII/PHI, such as the use of check sum, double-keying, message authentication, and digital signatures;

(h) the failure to implement and maintain written policies and procedures for recording and examining activity (system events and logs) in information systems that contain or use PII/PHI;

(i) the failure to require by contract that SAIC implement and maintain reasonable security procedures and practices to safeguard and protect PII/PHI from unauthorized access, destruction, use, modification and/or disclosure; and/or

(j) the failure to otherwise safeguard and protect Plaintiffs' and Class Members' PII/PHI.

110. Defendants are fully aware of recurring, systemic and fundamental deficiencies in their information security procedures, but have failed and refused to remedy the situation and properly safeguard and protect the PII/PHI in their custody and control—including Plaintiffs' and Class Members' PII/PHI. Defendants' repeated failure to correct known vulnerabilities in

their information security systems and procedures demonstrates an intentional and/or reckless disregard for Plaintiffs' and Class Members' privacy rights under the law.

**E.      Defendants' Inadequate Post-Disclosure Response**

111.    According to TRICARE's February 1, 2008 Operations Manual, TRICARE and its contractors:

> [S]hall inform affected individuals whenever they become aware that protected personal information pertaining to a Service member, civilian employee, military retiree, family member, or another individual affiliated with [DOD] has been lost, stolen or compromised.  Notification will take place as soon as possible, **but not later than ten days after the loss or compromise of protected personal information is discovered**.

(emphasis added).  Despite this policy, Defendants did not provide any information whatsoever to Plaintiffs and Class Members until the September 29 Notification, fifteen days after discovering the Data Breach.  Even then, the September 29 Notification was not specifically targeted to Plaintiffs and Class Members, but rather, to the public at large via a website that Plaintiffs and Class Members were not notified to read.  Specific notification to Plaintiffs and Class Members did not occur until several weeks later.

112.    The September 29 Notification was not only untimely and inadequate, it was woefully deficient.  The information provided was obscurely displayed on the TRICARE website and only vaguely explained the details of the Data Breach and the persons affected.  The September 29 Notification is also materially misleading, stating that the reason for delaying notification to affected TRICARE members was because TRICARE "… did not want to raise undue alarm in our beneficiaries …."   Thus, the September 29 Notification, in fact, was no notification to Plaintiffs and Class Members at all.

113.    There is no plausible explanation for Defendants' inconspicuous and vague September 29 Notification made at least a week after the required time to issue such a

notification under their own internal policies and procedures.  Approximately a week after the first press release and three weeks after the Data Breach, Defendants announced that specific notification would be sent by mail—*6 weeks later*.  As such, Defendants did not specifically notify the vast majority of Plaintiffs and Class Members until at least 9 weeks after the Data Breach occurred.

114.    During November 2011, two months after the Data Breach, SAIC began mailing letters to Plaintiffs and Class Members notifying them that their PII/PHI, in fact, had been disseminated to the world via the Data Breach ("SAIC Letters").  Unfortunately, notice via the SAIC Letters was also inadequate as a large number of Class Members did not receive the letters and could only confirm that they were victims of the Data Breach by contacting SAIC directly.

115.    Plaintiffs and Class Members had no reason to check their financial accounts and credit reports for suspicious activity arising from the Data Breach during this intervening period. Additionally, SAIC's "notice" to Plaintiffs and Class Members squarely placed the burden on them, rather than SAIC, to investigate and protect themselves from SAIC's heretofore undisclosed Data Breach.

116.    The SAIC Letters also are materially misleading.  The SAIC Letters, which are uniform except for the addressees, advise the recipients that "[t]he chance that your information could be obtained from these tapes is low … ."  Defendants, however, have since admitted that the data on the tapes was improperly encrypted or not encrypted at all.  That said, the purloined PII/PHI is easily available to motivated criminals.  The September 29 Notification posted on TRICARE's website is also materially misleading, stating that the reason for delaying notification to affected TRICARE members was because TRICARE "… did not want to raise undue alarm in our beneficiaries …."  Categorizing the risk of access as "low" and not wanting

"to raise undue alarm" are misleading statements as to the ongoing risk of identity theft, identity fraud and/or medical fraud faced by Plaintiffs and Class Members.

117.    The SAIC Letters also advised Plaintiffs and Class Members to take several steps to protect themselves in response to the Data Breach.   Unfortunately, many of these steps required them to incur additional out-of-pocket expenses.   For example, a victim of the Data Breach who placed a "security freeze" on his or her credit report, an option described in the SAIC letters, incurred an out-of-pocket cost of at least $5.00.   Monitoring one's credit reports, another option described in the SAIC letters, would cause a Data Breach victim to incur an expense to see his or her credit reports beyond the one free annual report to which they are entitled.   In short, enrolling in monitoring programs and/or purchasing identity theft insurance over and above the one year of credit monitoring offered by Defendants would require Plaintiffs and Class Members to invest additional time and money.

118.    Defendants' wrongful actions and inaction in failing to timely, completely and accurately notify Plaintiffs and Class Members about the Data Breach and corresponding unauthorized disclosure of their PII/PHI were arbitrary, capricious and in derogation of their duties to Plaintiff and Class Members and the notification procedures required by law.

119.    Defendants initially did not offer any direct assistance to Plaintiffs and Class Members pertaining to the Data Breach, nor did they explain any steps being taken to protect against future wrongful disclosures of Plaintiffs' and Class Members' PII/PHI.

120.    After Defendants were served with Plaintiffs' class action lawsuits, however, they completely reversed their position and, on or about November 7, 2011, Defendants issued a press release stating that TRICARE and DOD had directed SAIC to provide one year of free identity theft monitoring to all affected persons.

121.    The "protection" offered by Defendants, however, was woefully inadequate because, *inter alia*:

> (i)     Defendants offered only a single bureau credit monitoring program—as opposed to the industry recommended triple bureau program—that provided no protection to minors.  Each minor child victim continues to be fully exposed to damages;

> (ii)    Defendants did not provide any protection against medical identity theft, the victims of which are often left with huge medical bills, damaged credit, public disclosure of their medical condition and erroneous medical records.   According to a September 2011 report by PwC's Health Resource Institute "Old Data Learns New Tricks," the problem of medical identity theft is worsening and is the fastest growing form of identity theft. Old     Data     Learns     New     Tricks,     *available     at*: http://www.pwc.com/us/en/health-industries/publications/old-data-learns-new-tricks.jhtml  The "protection" offered by Defendants did nothing to protect against medical identity theft and fraudulent health insurance claims; and

> (iii)   it was offered by Defendants for only one year.  As reported by the FTC, however, a person impacted by identity theft should take proactive steps well after a year has passed to protect against identity theft and related risks as experts have found that data thieves typically hold stolen data for over a year before using it and/or re-selling it.

122.    Had Defendants complied with their own policies and procedures, as well as state and federal data breach notification statutes and guidelines, they would have swiftly notified Plaintiffs and Class Members about the Data Breach within ten days of learning of the incident.

123.    Plaintiffs and Class Members were thus not only injured as a result of the increased risk of identity theft, identity fraud and/or medical fraud to which they are now subjected, but have also been injured by virtue of the materially misleading statements downplaying the seriousness of the Data Breach.  These misstatements further injured Plaintiffs and the Class members in that they (i) effectively steered a large majority of consumers away from enrolling in Defendants' "protection" (thereby saving Defendants a substantial amount of

money), and (ii) worked to conceal the truth from Plaintiffs and Class Members concerning the true extent to which Defendants' wrongful conduct placed their PII/PHI in jeopardy.

**F.     The Harm Defendants Perpetrated on Plaintiffs and Class Members**

124.    Defendants flagrantly disregarded and/or violated Plaintiffs' and Class Members' privacy rights, and harmed them in the process, by not obtaining Plaintiffs' and Class Members' prior written consent to disclose their PII/PHI to any other person or government agency—as required by the Privacy Act, APA, FCRA, HIPAA, HITECH, California Confidentiality of Medical Information Act, and other pertinent laws, regulations, industry standards and/or internal company standards.

125.    Defendants flagrantly disregarded and/or violated Plaintiffs' and Class Members' privacy rights, and harmed them in the process, by failing to safeguard and protect and, in fact, wrongfully disseminating Plaintiffs' and Class Members' PII/PHI to the world.

126.    Defendants flagrantly disregarded and/or violated Plaintiffs' and Class Members' privacy rights, and harmed them in the process, by failing to keep or maintain an accurate accounting of the PII/PHI wrongfully disclosed in the Data Breach.

127.    Defendants flagrantly disregarded and/or violated Plaintiffs' and Class Members' privacy rights, and harmed them in the process, by failing to establish and/or implement appropriate administrative, technical and/or physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class Members' PII/PHI to protect against anticipated threats to the security or integrity of such information.  Defendants' security deficiencies allowed, and continue to allow, a single individual to access, remove from Defendants' premises, transport, disclose and/or compromise the PII/PHI of millions of United States citizens—including, without limitation, Plaintiffs and Class Members. Defendants' unwillingness or inability to establish and

maintain the proper information security procedures and controls is an abuse of discretion and confirms their intentional and willful failure to observe procedures required by law, industry standards and/or their own internal policies and procedures.

128.   Defendants flagrantly disregarded and/or violated Plaintiffs' and Class Members' privacy rights, and harmed them in the process, by failing to accurately and completely notify and inform Plaintiffs and Class Members about the Data Breach and corresponding loss of their PII/PHI within the ten-day period mandated by Defendants' own internal policies and procedures and/or various state laws.

129.   Defendants' untimely and inadequate notification—including their failure to provide Plaintiffs and Class Members with any meaningful protection or relief from the Data Breach—substantially increased Plaintiffs' and Class Members' risk of identity theft, identity fraud and/or medical fraud.

130.   Identity theft occurs when a person's personally identifying information, such as that person's name, Social Security number, or credit card number is used without his/her permission to commit fraud or other crimes. *See* Federal Trade Commission, Fighting Back Against Identity Theft, http://www.ftc.gov/bcp/edu/microsites/idtheft/consumers/about-identity-theft.html.[7]

131.   According to the FTC, "the range of privacy-related harms is more expansive than economic or physical harm or unwarranted intrusions and that any privacy framework should

---

[7]   According to the FTC, "Identity theft is serious. While some identity theft victims can resolve their problems quickly, others spend hundreds of dollars and many days repairing damage to their good name and credit record. Some consumers victimized by identity theft may lose out on job opportunities, or be denied loans for education, housing or cars because of negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit." *Id.*

recognize additional harms that might arise from unanticipated uses of data".[8]  Furthermore, "there is significant evidence demonstrating that technological advances and the ability to combine disparate pieces of data can lead to identification of a consumer, computer or device even if the individual pieces of data do not constitute PII."[9]

132.    According to the Javelin Report, in 2011, the mean consumer cost of rectifying identity fraud was $354 while the mean resolution time of identity fraud was 12 hours.  *Id.* at 6. In 2011, the consumer cost for new account fraud and existing non-card fraud increased 33% and 50% respectively.  *Id.* at 9.   Consumers who received a data breach notification had a fraud incidence rate of 19% in 2011 and, of those experiencing fraud, 43% reported their credit card numbers were stolen and 22% of the victims reported their debit card numbers were stolen.  *Id.* at 10.  More important, consumers who were notified that their PII/PHI had been breached were 9.5 times more likely to experience identity fraud than consumers who did not receive such a notification. *Id.* at 39.

133.    Defendants' untimely and inadequate Data Breach notification substantially increased Plaintiffs' and Class Members' risk of "phishing" (as defined above).

134.    A fraudster can easily research the email address of a Data Breach victim.  When a fraudster has access to PII/PHI from a large group of similarly situated victims, it is much more feasible to develop a believable phishing spoof email that appears realistic. The fraudsters can

---

[8]   *Protecting Consumer Privacy in an Era of Rapid Change* FTC, Report March 2012 (http://www.ftc.gov/os/2012/03/120326privacyreport.pdf).

[9] *Protecting Consumer Privacy in an Era of Rapid Change: A Proposed Framework for Businesses and Policymakers*, *Preliminary FTC Staff Report*, 35-38 (Dec. 2010), *available at* http://www.ftc.gov/os/2010/12/101201privacyreport.pdf; *Comment of Center for Democracy & Technology,* cmt. #00469, at 3; *Comment of Statz, Inc.*, cmt. #00377, at 11-12.

then convince the group of victims to reveal  additional private banking account and credit card

information.

135.    A person whose personal information has been compromised may not see any signs

of identity theft for *years*.  According to the GAO's June 2007 report on Data Breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up
> to a year or more before being used to commit identity theft. Further, once stolen data
> have been sold or posted on the Web, fraudulent use of that information may continue
> for years. As a result, studies that attempt to measure the harm resulting from data
> breaches cannot necessarily rule out all future harm.

136.    PII/PHI is such a valuable commodity to identity thieves that once the information

has been compromised, criminals often trade the information on the "cyber black-market" for a

number of years.[10]    Identity thieves and other cyber criminals openly post stolen credit card

numbers, Social Security numbers and other PII/PHI directly on various Internet websites,

thereby making the information publicly available. In one study, researchers found hundreds of

websites displaying stolen PII/PHI.  Strikingly, none of these websites were blocked by Google's

safeguard filtering mechanism—the "Safe Browsing list."  The study concluded:

> It is clear from the current state of the credit card black-market that cyber
> criminals can operate much too easily on the Internet. They are not afraid to put
> out their email addresses, in some cases phone numbers and other credentials in
> their advertisements. It seems that the black market for cyber criminals is not
> underground at all. In fact, it's very "in your face."[11]

137.    "[H]ealth information is far more valuable than Social Security numbers" on the

cyber black market according to Dr. Deborah Peel, founder and chairwoman of Patient Privacy

---

[10] Companies, in fact, also recognize PII/PHI  as an extremely valuable commodity akin to a form of
personal property.  For example, Symantec Corporation's Norton brand has created a software application that
values  a  person's  identity  on  the  black  market.  Risk  Assessment  Tool,  Norton  2010,
www.everyclickmatters.com/victim/assessment-tool.html; *see also* T. Soma, *et al*, *Corporate Privacy Trend: The
"Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. &
TECH. 11, at *3-4 (2009).

[11] http://www.stopthehacker.com/2010/03/03/the-underground-credit-card-
blackmarket/.

Rights.[12]  An ABC News search uncovered one internet seller offering medical record database dumps for $14 to $25 per person.  ABC News was then sent, unsolicited, 40 individuals' private health information, including their names, addresses and body mass index.  Another inquiry yielded an offer of more than 100 records including everything from Social Security numbers to whether someone suffered from anxiety, hypertension, and their HIV status.  Plaintiffs' and Class Members' PII/PHI could similarly be valued and traded on the cyber black market.

138.   Defendant Secretary is ultimately responsible for the design, adoption, implementation, control, direction, oversight, management, monitoring and auditing of Defendants' processes, controls, policies, procedures and protocols for complying with the Privacy Act and other applicable laws to safeguard and protect the PII/PHI entrusted to Defendants.  Defendant Secretary, however, failed to ensure that such processes, controls, policies, procedures and protocols were adequately designed, adopted, implemented, controlled, directed, overseen, managed, monitored and/or audited by his subordinates.  Defendant Secretary knew, or should have known, that DOD had longstanding and pervasive deficiencies in its PII/PHI security processes, controls, policies, procedures and protocols that threatened Plaintiffs' and Class Members' privacy rights, but failed and refused to correct such deficiencies.  Defendant Secretary flagrantly disregarded and/or violated Plaintiffs' and Class Members' privacy rights, and harmed them in the process, by failing to do so—thereby directly and/or proximately paving the way for the Data Breach, dissemination of Plaintiffs' and Class Members' PII/PHI to the world and the damages they suffered as set forth above.

139.   On October 14, 2011, DOD and two other government agencies issued a Proposed Rule designed to ensure that government contractors provide adequate privacy training to their

---

[12] http://abcnews.go.com/Health/medical-records-private-abc-news-investigation/story?id=17228986&page=2#.UGRgtq7yBR4.

staff members.  The Proposed Rule would amend the Federal Acquisition Regulation "to require contractors to complete training that addresses the protection of privacy, in accordance with the Privacy Act of 1974, and the handling and safeguarding of personally identifiable information."

140.    On information and belief, the Proposed Rule was the result of Defendants' failure to design, adopt, implement, control, direct, oversee, manage, monitor and/or audit the appropriate processes, controls, policies, procedures and protocols for complying with the Privacy Act and other applicable laws to safeguard and protect the PII/PHI entrusted to Defendants and the resulting class action lawsuits.

141.    Defendants flagrantly disregarded and/or violated Plaintiffs' and Class Members' privacy rights, and harmed them in the process, by depriving Plaintiffs and Class Members of the value of their PII/PHI, for which there is a well-established national and international market. *See, e.g.,* Soma, *supra* ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted); ABC News Report, *supra*.

142.    Aside from the criminal element, frequent purchasers of purloined PHI include pharmacies, drug manufacturers, medical device manufacturers, hospitals and insurance companies who use the information to market their products and services directly to the data breach victims and/or to adjust the victims' medical insurance premiums.  *Id*.  Plaintiffs and Class Members, not data thieves, should have the right to sell their PII/PHI and receive the corresponding financial benefits.

143.    The actual harm and adverse effects to Plaintiffs and Class Members, including the imminent, immediate and continuing increased risk of harm for identity theft, identity fraud and/or medical fraud directly and/or proximately caused by Defendants' above wrongful actions

and/or inaction and the resulting Data Breach requires Plaintiffs and Class Members to take affirmative acts to recover their peace of mind, and personal security including, without limitation, purchasing credit reporting services, purchasing credit monitoring and/or internet monitoring services, frequently obtaining, purchasing and reviewing credit reports, bank statements, and other similar information, and/or closing or modifying financial accounts—for which there is a financial and temporal cost.  Plaintiffs and Class Members have suffered, and will continue to suffer, such damages for the foreseeable future.

144.    As a direct and/or proximate result of Defendants' above wrongful actions and/or inaction and the resulting Data Breach, Plaintiffs and Class Members also have been forced to cancel payment card accounts and close bank accounts, open new payment card accounts and bank accounts, stop direct deposits to compromised accounts and re-enroll direct deposits for new accounts, stop recurring electronic payments from compromised accounts and re-enroll electronic payments for new accounts, and otherwise spend time and money mitigating the actual and potential negative impacts to such accounts and their finances in response to notifications of identity theft, identity fraud and/or medical fraud resulting from the Data Breach.

145.    Additionally, as a result of Defendants' failure to follow contractually-agreed upon, federally-prescribed, industry standard security procedures, certain Plaintiffs and Class Members received a diminished value of the services they paid TRICARE to provide.  Upon information and belief, a portion of the health and dental insurance premiums paid by certain Plaintiffs and Class Members is for healthcare-related services, such as data management and data security.  They contracted for an insurance plan that included a guarantee by Defendants to safeguard and protect their PII/PHI, but instead, received a plan devoid of these important protections.  Despite failing to implement or inadequately implementing policies to safeguard and protect their PII/PHI,

Defendants have the beneficial use and enjoyment of the full amount of the health and dental insurance premiums they paid.

146.    Victims and potential victims of identity theft, identity fraud and/or medical fraud—such as Plaintiffs and Class Members—typically spend hundreds of hours in personal time and hundreds of dollars in personal funds to resolve credit and other financial issues resulting from data breaches.  *See Defend: Recover from Identity Theft*, http://www.ftc.gov/bcp/edu/microsites/idtheft//consumers/defend.html;  *Fight Identity Theft*, www.fightidentitytheft.com.  According to the Javelin Report, not only is there a substantially increased risk of identity theft and identity fraud for data breach victims, those who are further victimized by identity theft or identity fraud will incur an average fraud-related economic loss of $1,513 and incur an average of $354 of out-of-pocket expenses attempting to rectify the situation.  *Id*. at 6.

147.    Other statistical analyses are in accord.  The GAO found that identity thieves use PII/PHI to open financial accounts and payment card accounts and incur charges in a victim's name.  This type of identity theft is the "most damaging" because it may take some time for the victim to become aware of the theft, in the meantime causing significant harm to the victim's credit rating and finances.  Moreover, unlike other PII/PHI, Social Security numbers are incredibly difficult to change and their misuse can continue for years into the future.

148.    Identity thieves also use Social Security numbers to commit other types of fraud, such as obtaining false identification cards, obtaining government benefits in the victim's name, committing crimes and/or filing fraudulent tax returns on the victim's behalf to obtain fraudulent tax refunds.  Identity thieves also obtain jobs using stolen Social Security numbers, rent houses and apartments and/or obtain medical services in the victim's name.  Identity thieves also have

been known to give a victim's personal information to police during an arrest, resulting in the issuance of an arrest warrant in the victim's name and an unwarranted criminal record.  The GAO states that victims of identity theft face "substantial costs and inconvenience repairing damage to their credit records," as well the damage to their "good name."

149.    The unauthorized disclosure of a person's Social Security number can be particularly damaging since Social Security numbers cannot be easily replaced like a credit card or debit card.  In order to obtain a new Social Security number, a person must show evidence that someone is using the number fraudulently or is being disadvantaged by the misuse.  *See* Identity Theft and Your Social Security Number, SSA Publication No. 05-10064, October 2007*, ICN 46327 (http://www.ssa.gov/pubs/10064.html).  Thus, a person whose PII/PHI has been stolen cannot obtain a new Social Security number until the damage has already been done.

150.    Obtaining a new Social Security number also is not an absolute prevention against identity theft. Government agencies, private businesses and credit reporting companies likely still have the person's records under the old number, so using a new number will not guarantee a fresh start.  For some victims of identity theft, a new number may actually create new problems. Because prior positive credit information is not associated with the new Social Security number, it is more difficult to obtain credit due to the absence of a credit history.

151.    Medical identity theft (or medical fraud) occurs when a person's personal information is used without authorization to obtain, or receive payment for, medical treatment, services or goods. *See* www.ftc.gov/bcp/edu/microsites/idtheft/consumers/resolving-specific-id-theft-problems.html (last visited October 19, 2011).  For example, as of 2010, more than 50 million people in the United States did not have health insurance according to the U.S. census. This, in turn has led to a surge in medical identity theft as a means of fraudulently obtaining

medical care. "Victims of medical identity theft [also] may find that their medical records are inaccurate, which can have a serious impact on their ability to obtain proper medical care and insurance benefits." *Id.*

152.    Defendants' wrongful actions and/or inaction directly and/or proximately caused the "double Holy Grail of data breaches"—the theft and dissemination into the public domain of Plaintiffs' and Class Members' PII/PHI without their knowledge, authorization and/or consent. As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiffs and Class Members have incurred damages in the form of, *inter alia*, (i) loss of privacy, (ii) the imminent, immediate and continuing increased risk of identity theft, identity fraud and/or medical fraud, (iii) out-of-pocket expenses to purchase credit monitoring, internet monitoring, identity theft insurance and/or other Data Breach risk mitigation products, (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (v) the value of their time spent mitigating the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (vi) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, and/or (vii) the diminished value of the services they paid TRICARE to provide.

## CLASS ACTION ALLEGATIONS

153.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action against Defendants as a national class action on behalf of themselves and all members of the following class of similarly situated individuals (the "Nationwide Class"):

> All natural persons whose Social Security numbers, addresses, telephone numbers, medical diagnoses, medical treatment information, health care provider names and locations, clinical notes, lab test results, prescription information, and other highly confidential and private personally identifying information and

personal health information (PII/PHI) were contained on backup data tapes taken from an SAIC employee's vehicle in San Antonio, Texas on or about September 12, 2011.  Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, Defendants' officers, directors, agents and legal representatives, the Court and Court personnel.

154.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure and/or the statutes of the respective states listed below, Plaintiffs also bring this action against Defendants on behalf of themselves and all members of the following classes of similarly situated individuals (collectively, the "State Sub-Classes"):

a.   **ALABAMA:** All natural persons residing in Alabama whose Social Security numbers, addresses, telephone numbers, medical diagnoses, medical treatment information, health care provider names and locations, clinical notes, lab test results, prescription information, and other highly confidential and private personally identifying information and personal health information (PII/PHI) was contained on backup data tapes taken from an SAIC employee's vehicle in San Antonio, Texas on or about September 12, 2011.  Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, Defendants' officers, directors, agents and legal representatives, the Court and Court personnel (the "Alabama Sub-Class").

b.   **CALIFORNIA:** All natural persons residing in California whose Social Security numbers, addresses, telephone numbers, medical diagnoses, medical treatment information, health care provider names and locations, clinical notes, lab test results, prescription information, and other highly confidential and private personally identifying information and personal health information (PII/PHI) was contained on backup data tapes taken from an SAIC employee's vehicle in San Antonio, Texas on or about September 12, 2011.  Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, Defendants' officers, directors, agents and legal representatives, the Court and Court personnel (the "California Sub-Class").

c.   **COLORADO:**  All natural persons residing in Colorado whose Social Security numbers, addresses, telephone numbers, medical diagnoses, medical treatment information, health care provider names and locations, clinical notes, lab test results, prescription information, and other highly confidential and private

personally identifying information and personal health information (PII/PHI) was contained on backup data tapes taken from an SAIC employee's vehicle in San Antonio, Texas on or about September 12, 2011.  Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, Defendants' officers, directors, agents and legal representatives, the Court and Court personnel (the "Colorado Sub-Class").

d.      **FLORIDA:**  All natural persons residing in Florida whose Social Security numbers, addresses, telephone numbers, medical diagnoses, medical treatment information, health care provider names and locations, clinical notes, lab test results, prescription information, and other highly confidential and private personally identifying information and personal health information (PII/PHI) was contained on backup data tapes taken from an SAIC employee's vehicle in San Antonio, Texas on or about September 12, 2011.  Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, Defendants' officers, directors, agents, employees and legal representatives, the Court and Court personnel (the "Florida Sub-Class").

e.      **GEORGIA:** All natural persons residing in Georgia whose Social Security numbers, addresses, telephone numbers, medical diagnoses, medical treatment information, health care provider names and locations, clinical notes, lab test results, prescription information, and other highly confidential and private personally identifying information and personal health information (PII/PHI) was contained on backup data tapes taken from an SAIC employee's vehicle in San Antonio, Texas on or about September 12, 2011.  Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, Defendants' officers, directors, agents and legal representatives, the Court and Court personnel (the "Georgia Sub-Class").

f.      **HAWAII:**  All natural persons residing in Hawaii whose Social Security numbers, addresses, telephone numbers, medical diagnoses, medical treatment information, health care provider names and locations, clinical notes, lab test results, prescription information, and other highly confidential and private personally identifying information and personal health information (PII/PHI) was contained on backup data tapes taken from an SAIC employee's vehicle in San Antonio, Texas on or about September 12, 2011.  Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, Defendants' officers, directors, agents and legal representatives, the Court and Court personnel (the "Hawaii Sub-Class").

g.     **IDAHO:**   All natural persons residing in Idaho whose Social Security numbers, addresses, telephone numbers, medical diagnoses, medical treatment information, health care provider names and locations, clinical notes, lab test results, prescription information, and other highly confidential and private personally identifying information and personal health information (PII/PHI) was contained on backup data tapes taken from an SAIC employee's vehicle in San Antonio, Texas on or about September 12, 2011.  Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, Defendants' officers, directors, agents and legal representatives, the Court and Court personnel (the "Idaho Sub-Class").

h.     **INDIANA:**   All natural persons residing in Indiana whose Social Security numbers, addresses, telephone numbers, medical diagnoses, medical treatment information, health care provider names and locations, clinical notes, lab test results, prescription information, and other highly confidential and private personally identifying information and personal health information (PII/PHI) was contained on backup data tapes taken from an SAIC employee's vehicle in San Antonio, Texas on or about September 12, 2011.  Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, Defendants' officers, directors, agents and legal representatives, the Court and Court personnel (the "Indiana Sub-Class").

i.     **KENTUCKY:** All natural persons residing in Kentucky whose Social Security numbers, addresses, telephone numbers, medical diagnoses, medical treatment information, health care provider names and locations, clinical notes, lab test results, prescription information, and other highly confidential and private personally identifying information and personal health information (PII/PHI) was contained on backup data tapes taken from an SAIC employee's vehicle in San Antonio, Texas on or about September 12, 2011.  Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, Defendants' officers, directors, agents and legal representatives, the Court and Court personnel (the "Kentucky Sub-Class").

j.     **MARYLAND:** All natural persons residing in Maryland whose Social Security numbers, addresses, telephone numbers, medical diagnoses, medical treatment information, health care provider names and locations, clinical notes, lab test results, prescription information, and other highly confidential and private personally identifying information and personal health information

59

(PII/PHI) was contained on backup data tapes taken from an SAIC employee's vehicle in San Antonio, Texas on or about September 12, 2011.  Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, Defendants' officers, directors, agents and legal representatives, the Court and Court personnel (the "Maryland Sub-Class").

k.   **MASSACHUSETTS:** All natural persons residing in Massachusetts whose Social Security numbers, addresses, telephone numbers, medical diagnoses, medical treatment information, health care provider names and locations, clinical notes, lab test results, prescription information, and other highly confidential and private personally identifying information and personal health information (PII/PHI) was contained on backup data tapes taken from an SAIC employee's vehicle in San Antonio, Texas on or about September 12, 2011.  Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, Defendants' officers, directors, agents and legal representatives, the Court and Court personnel (the "Massachusetts Sub-Class").

l.   **MICHIGAN:** All natural persons residing in Michigan whose Social Security numbers, addresses, telephone numbers, medical diagnoses, medical treatment information, health care provider names and locations, clinical notes, lab test results, prescription information, and other highly confidential and private personally identifying information and personal health information (PII/PHI) was contained on backup data tapes taken from an SAIC employee's vehicle in San Antonio, Texas on or about September 12, 2011.  Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, Defendants' officers, directors, agents and legal representatives, the Court and Court personnel (the "Michigan Sub-Class").

m.   **MISSISSIPPI:** All natural persons residing in Mississippi whose Social Security numbers, addresses, telephone numbers, medical diagnoses, medical treatment information, health care provider names and locations, clinical notes, lab test results, prescription information, and other highly confidential and private personally identifying information and personal health information (PII/PHI) was contained on backup data tapes taken from an SAIC employee's vehicle in San Antonio, Texas on or about September 12, 2011.  Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, Defendants' officers, directors, agents and legal representatives, the Court and Court personnel (the "Mississippi Sub-Class").

n.     **MISSOURI:** All natural persons residing in Missouri whose Social Security numbers, addresses, telephone numbers, medical diagnoses, medical treatment information, health care provider names and locations, clinical notes, lab test results, prescription information, and other highly confidential and private personally identifying information and personal health information (PII/PHI) was contained on backup data tapes taken from an SAIC employee's vehicle in San Antonio, Texas on or about September 12, 2011. Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, Defendants' officers, directors, agents and legal representatives, the Court and Court personnel (the "Missouri Sub-Class").

o.     **NEW YORK:** All natural persons residing in New York whose Social Security numbers, addresses, telephone numbers, medical diagnoses, medical treatment information, health care provider names and locations, clinical notes, lab test results, prescription information, and other highly confidential and private personally identifying information and personal health information (PII/PHI) was contained on backup data tapes taken from an SAIC employee's vehicle in San Antonio, Texas on or about September 12, 2011. Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, Defendants' officers, directors, agents and legal representatives, the Court and Court personnel (the "New York Sub-Class").

p.     **NORTH CAROLINA:** All natural persons residing in North Carolina whose Social Security numbers, addresses, telephone numbers, medical diagnoses, medical treatment information, health care provider names and locations, clinical notes, lab test results, prescription information, and other highly confidential and private personally identifying information and personal health information (PII/PHI) was contained on backup data tapes taken from an SAIC employee's vehicle in San Antonio, Texas on or about September 12, 2011. Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, Defendants' officers, directors, agents and legal representatives, the Court and Court personnel (the "North Carolina Sub-Class").

q.     **OHIO:** All natural persons residing in Ohio whose Social Security numbers, addresses, telephone numbers, medical diagnoses, medical treatment information, health care provider names and locations, clinical notes, lab test results, prescription information, and other highly confidential and private personally

identifying information and personal health information (PII/PHI) was contained on backup data tapes taken from an SAIC employee's vehicle in San Antonio, Texas on or about September 12, 2011. Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, Defendants' officers, directors, agents and legal representatives, the Court and Court personnel (the "Ohio Sub-Class").

r.　**OKLAHOMA:** All natural persons residing in Oklahoma whose Social Security numbers, addresses, telephone numbers, medical diagnoses, medical treatment information, health care provider names and locations, clinical notes, lab test results, prescription information, and other highly confidential and private personally identifying information and personal health information (PII/PHI) was contained on backup data tapes taken from an SAIC employee's vehicle in San Antonio, Texas on or about September 12, 2011. Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, Defendants' officers, directors, agents and legal representatives, the Court and Court personnel (the "Oklahoma Sub-Class").

s.　**OREGON:** All natural persons residing in Oregon whose Social Security numbers, addresses, telephone numbers, medical diagnoses, medical treatment information, health care provider names and locations, clinical notes, lab test results, prescription information, and other highly confidential and private personally identifying information and personal health information (PII/PHI) was contained on backup data tapes taken from an SAIC employee's vehicle in San Antonio, Texas on or about September 12, 2011. Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, Defendants' officers, directors, agents and legal representatives, the Court and Court personnel (the "Oregon Sub-Class").

t.　**SOUTH CAROLINA:** All natural persons residing in South Carolina whose Social Security numbers, addresses, telephone numbers, medical diagnoses, medical treatment information, health care provider names and locations, clinical notes, lab test results, prescription information, and other highly confidential and private personally identifying information and personal health information (PII/PHI) was contained on backup data tapes taken from an SAIC employee's vehicle in San Antonio, Texas on or about September 12, 2011. Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, Defendants' officers, directors, agents and

legal representatives, the Court and Court personnel (the "South Carolina Sub-Class").

u.     **TENNESSEE:** All natural persons residing in Tennessee whose Social Security numbers, addresses, telephone numbers, medical diagnoses, medical treatment information, health care provider names and locations, clinical notes, lab test results, prescription information, and other highly confidential and private personally identifying information and personal health information (PII/PHI) was contained on backup data tapes taken from an SAIC employee's vehicle in San Antonio, Texas on or about September 12, 2011.  Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, Defendants' officers, directors, agents and legal representatives, the Court and Court personnel (the "Tennessee Sub-Class").

v.     **TEXAS:** All natural persons residing in Texas whose Social Security numbers, addresses, telephone numbers, medical diagnoses, medical treatment information, health care provider names and locations, clinical notes, lab test results, prescription information, and other highly confidential and private personally identifying information and personal health information (PII/PHI) was contained on backup data tapes taken from an SAIC employee's vehicle in San Antonio, Texas on or about September 12, 2011.  Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, Defendants' officers, directors, agents and legal representatives, the Court and Court personnel (the "Texas Sub-Class").

w.     **VIRGINIA:** All natural persons residing in Virginia whose Social Security numbers, addresses, telephone numbers, medical diagnoses, medical treatment information, health care provider names and locations, clinical notes, lab test results, prescription information, and other highly confidential and private personally identifying information and personal health information (PII/PHI) was contained on backup data tapes taken from an SAIC employee's vehicle in San Antonio, Texas on or about September 12, 2011.  Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, Defendants' officers, directors, agents and legal representatives, the Court and Court personnel (the "Virginia Sub-Class").

x.     **WASHINGTON:**     All natural persons residing in Washington whose Social Security numbers, addresses, telephone numbers, medical diagnoses, medical treatment information, health care provider names and locations, clinical notes, lab test results,

prescription information, and other highly confidential and private personally identifying information and personal health information (PII/PHI) was contained on backup data tapes taken from an SAIC employee's vehicle in San Antonio, Texas on or about September 12, 2011.  Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, Defendants' officers, directors, agents and legal representatives, the Court and Court personnel (the "Washington Sub-Class").

155.    The members of the Nationwide Class and State Sub-Classes are so numerous that their joinder is impracticable.  According to information provided by Defendants, there are over 4.7 million Nationwide Class Members.  The smallest individual State Sub-Class is the Oregon Sub-Class with approximately 15,000 Members.  The precise Nationwide Class and State Sub-Class Members and their addresses are currently unknown to Plaintiffs, but can be easily derived from Defendants' internal records that were used to send the SAIC Letters to Plaintiffs and Class Members notifying them of the Data Breach.

156.    The rights of each Plaintiff and each Nationwide Class Member and respective State Sub-Class Member were violated in a virtually identical manner as a result of Defendants' wrongful actions and/or inaction that caused the Data Breach and the unauthorized disclosure of Plaintiffs' and Class Members' PII/PHI.

157.    There are questions of law and fact common to the Nationwide Class and individual State Sub-Classes as a whole.  The common questions of law and fact predominate over any questions affecting only individual members of the Nationwide Class and individual State Sub-Classes Class and include, without limitation:

    a.  Whether Defendants adequately designed, adopted, implemented, controlled, directed, oversaw, managed, monitored and/or audited the appropriate data security processes, controls, policies, procedures and/or protocols to safeguard and protect Plaintiffs' and Class Members' PII/PHI disclosed without authorization in the Data Breach;

     b.   Whether the Government Defendants' failure to properly safeguard and protect Plaintiffs' and Class Members' PII/PHI was willful, reckless, arbitrary, capricious and/or otherwise not in accordance with the applicable protocols, procedures, guidelines, laws and/or regulations;

     c.   Whether Defendants failed to inform Plaintiffs and Class Members of the Data Breach and the unauthorized disclosure of their PII/PHI in a manner and within the time period required by their own internal policies and procedures and/or the applicable laws;

     d.   Whether Defendants' actions and/or inaction that caused the Data Breach and the unauthorized disclosure of Plaintiffs' and Class Members' PII/PHI violated the applicable laws;

     e.   Whether Plaintiffs and Class Members were harmed by Defendants' actions and/or inaction that caused the Data Breach and the unauthorized disclosure of Plaintiffs' and Class Members' PII/PHI; and

     f.   Whether Plaintiffs and Class Members suffered damages as a direct result of Defendants' actions and/or inaction that caused the Data Breach and the unauthorized disclosure of Plaintiffs' and Class Members' PII/PHI.

158.    Plaintiffs' claims are typical of the claims of the Nationwide Class Members and respective State Sub-Class Members because Plaintiffs, like all Class Members, are victims of Defendants' wrongful actions and/or inaction that caused the Data Breach, caused the unauthorized disclosure of Plaintiffs' and Class Members' PII/PHI, and caused Plaintiffs and Class Members to suffer the resulting damages.

159.    Plaintiffs and their counsel will fairly and adequately represent the interests of the Nationwide Class Members and respective State Sub-Class Members.  Plaintiffs have no interests antagonistic to, or in conflict with, any of the Class Members' interests. Plaintiffs' lawyers are highly experienced in the prosecution of complex commercial litigation, consumer class actions, and data breach cases.

160.    A class action is superior to all other available methods for fairly and efficiently adjudicating Plaintiffs' and Class Members' claims.  Plaintiffs and Class Members have been

irreparably harmed as a result of Defendants' wrongful actions and/or inaction that caused the Data Breach and the unauthorized disclosure of Plaintiffs' and Class Members' PII/PHI. Litigating this case as a class action is appropriate because (i) it will avoid a multiplicity of suits and the corresponding burden on the courts and Parties, (ii) it would be virtually impossible for all Nationwide Class Members and State Sub-Class Members to intervene as parties-plaintiff in this action, (iii) it will allow numerous individuals with claims too small to adjudicate on an individual basis because of prohibitive litigation costs to obtain redress for their injuries, and (iv) it will provide court oversight of the claims process once Defendants' liability is adjudicated.

161.    Certification of the Nationwide Class and/or the respective State Sub-Classes, therefore, is appropriate under FED. R. CIV. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual Class Members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

162.    Certification of the Nationwide Class and/or the respective State Sub-Classes also is appropriate under FED. R. CIV. P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and/or equitable relief with respect to the Class as a whole.

163.    Certification of the Nationwide Class and/or the respective State Sub-Classes also is appropriate under FED. R. CIV. P. 23(b)(1) because the prosecution of separate actions by individual Class Members would create a risk of establishing incompatible standards of conduct for Defendants.  For example, one court might decide that the challenged actions and/or inaction are illegal and enjoin Defendants, while another court might decide that the same actions and/or inaction are not illegal.  Individual actions also could be dispositive of the interests of the other

Class Members who were not parties to such actions and substantially impair or impede their ability to protect their interests.

164.    Defendants' wrongful actions and/or inaction are generally applicable to the Nationwide Class and/or the respective State Sub-Classes as a whole, and Plaintiffs seek, *inter alia*, equitable remedies with respect to the Class as a whole.

165.    Defendants' systemic policies and practices also make declaratory relief with respect to the Nationwide Class and/or the respective State Sub-Classes as a whole appropriate.

166.    Absent a class action, therefore, Defendants will retain the benefits of their wrongdoing despite their serious violations of the law and infliction of harm on Plaintiffs and Class Members.

## CLAIMS AND CAUSES OF ACTION

### COUNT I

### VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT
### (5 U.S.C. § 706, *et seq.*)
### (Nationwide Class Against the Government Defendants)

167.    The preceding factual statements and allegations are incorporated herein by reference.

168.    The Government Defendants possess and were (and continue to be) charged with safeguarding, protecting and maintaining the privacy of Plaintiffs' and Class Members' PII/PHI. The Government Defendants, however, have repeatedly demonstrated their inability, unwillingness and/or callous disregard of their obligation to design, adopt, implement, control, direct, oversee, manage, monitor and/or audit appropriate data security processes, controls, policies, procedures and/or protocols of their agents in order to safeguard and protect Plaintiffs' and Class Members' PII/PHI entrusted to them.

169.   Defendant Secretary is ultimately responsible in his official capacity for safeguarding and protecting citizens' PII/PHI in the possession and control of DOD, its sub-units and its non-government contractors pursuant to the applicable laws, including the Privacy Act and APA, but has been unable or unwilling to ensure compliance with such laws.

170.   The Government Defendants' wrongful actions and failure to safeguard and protect Plaintiffs' and Class Members' PII/PHI were willful, reckless, arbitrary, capricious and otherwise not in accordance with the law.

171.   Plaintiffs and Class Members have suffered, and continue to suffer, damages and other harm as a direct and/or proximate result of the Government Defendants' wrongful actions and/or inaction and the resulting Data Breach in the form of, *inter alia*, (i) loss of privacy, (ii) the imminent, immediate and continuing increased risk of identity theft, identity fraud and/or medical fraud, (iii) out-of-pocket expenses to purchase credit monitoring, internet monitoring, identity theft insurance and/or other Data Breach risk mitigation products, (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (v) the value of their time spent mitigating the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (vi) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, and/or (vii) the diminished value of the services they paid TRICARE to provide.

172.   Plaintiffs and Class Members, therefore, are entitled to equitable relief and all other relief for the Government Defendants' violation of Plaintiffs' and Class Members' rights under the APA.

**COUNT II**

**VIOLATION OF THE PRIVACY ACT OF 1974**
**(5 U.S.C. § 552a, *et seq.*)**
**(Nationwide Class Against the Government Defendants)**

173.     The preceding factual statements and allegations are incorporated herein by reference.

174.     Pursuant to the Privacy Act, an intentional and/or willful violation occurs when a party exhibits patently egregious and unlawful behavior.

175.     By virtue of their above-described wrongful actions and/or inaction, each of the Government Defendants violated the Privacy Act.  The Government Defendants' Privacy Act violations, which resulted from their patently egregious and unlawful behavior, were intentional and/or willful.  The Government Defendants' Privacy Act violations directly and/or proximately caused Plaintiffs' and Class Members to suffer damages and other harm.

176.     The Government Defendants' continued failure to safeguard, protect and prevent the unauthorized disclosure of Plaintiffs' and Class Members' PII/PHI in particular has caused Plaintiffs and Class Members to suffer actual damages in the form of, *inter alia*, (i) loss of privacy, (ii) the imminent, immediate and continuing increased risk of identity theft, identity fraud and/or medical fraud, (iii) out-of-pocket expenses to purchase credit monitoring, internet monitoring, identity theft insurance and/or other Data Breach risk mitigation products, (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (v) the value of their time spent mitigating the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (vi) deprivation of the value of their PII/PHI, for which there is a well-established

national and international market, and/or (vii) the diminished value of the services they paid

TRICARE to provide.

177.    Plaintiffs and Class Members, therefore, are entitled to monetary relief and all

other relief, including statutory damages of $1,000 each, as well as attorneys' fees, litigation

expenses and costs, for the Government Defendants' Privacy Act violations.

**COUNT III**

**WILLFUL VIOLATION OF THE FAIR CREDIT REPORTING ACT**
**(15 U.S.C. § 1681, *et seq*.)**
**(Nationwide Class Against SAIC)**

178.    The preceding factual statements and allegations are incorporated herein by

reference.

179.    FCRA requires consumer reporting agencies to adopt and maintain procedures for

meeting the needs of commerce for consumer credit, personnel, insurance and other information

in a manner fair and equitable to consumers while maintaining the confidentiality, accuracy,

relevancy and proper utilization of such information.  15 U.S.C. § 1681(b).

180.    FCRA defines a "consumer reporting agency" as:

> Any person which, for monetary fees, dues, or on a cooperative nonprofit basis,
> regularly engages in whole or in part in the practice of assembling or evaluating
> consumer credit information or other information on consumers for the purpose of
> furnishing consumer reports to third parties, and which uses any means or facility
> of interstate commerce for the purpose of preparing or furnishing consumer
> reports.

15 U.S.C. § 1681a(f).

181.    FCRA defines a "consumer report" as:

> [A]ny written, oral, or other communication of any information by a consumer
> reporting agency bearing on a consumer's credit worthiness, credit standing,
> credit capacity, character, general reputation, personal characteristics, or mode of
> living which is used or expected to be used or collected in whole or in part for the
> purpose of establishing the consumer's eligibility for credit or insurance to be

used primarily for personal, family, or household purposes, employment purposes, or any other purpose authorized under [15 U.S.C. §] 1681(b).

15 U.S.C. § 1681a(d)(1).

182.   FCRA defines "medical information" as:

[I]nformation or data, whether oral or recorded, in any form or medium, created by or derived from a health care provider or the consumer, that relates to – (A) the past, present, or future physical, mental, or behavioral health or condition of an individual; (B) the provision of health care to an individual; or (C) the payment for the provision of health care to an individual.

15 U.S.C. § 1681a(i).

183.   FCRA specifically protects medical information, restricting its dissemination to limited instances.  *See, e.g.,* 15 U.S.C. §§ 1681a(d)(3), 1681b(g), 1681c(a)(6).

184.   SAIC is a Consumer Reporting Agency as defined under FCRA because on a cooperative nonprofit basis and/or for monetary fees, SAIC regularly engages, in whole or in part, in the practice of assembling information on consumers for the purpose of furnishing Consumer Reports to third parties and/or uses interstate commerce for the purpose of preparing and/or furnishing Consumer Reports.

185.   As a Consumer Reporting Agency, SAIC was (and continues to be) required to adopt and maintain processes, controls, policies, procedures and/or protocols to safeguard, protect and limit the dissemination of consumer credit, personnel, insurance, and other information (such as Plaintiffs' and Class Members' PII/PHI) in a manner fair and equitable to consumers while maintaining the confidentiality, accuracy, relevancy and proper utilization of such information.   SAIC, however, violated FCRA by failing to adopt and maintain such protective procedures which, in turn, directly and/or proximately resulted in the theft of the backup data tapes and wrongful dissemination of Plaintiffs' and Class Members' PII/PHI into the public domain.

186.    Plaintiffs' and Class Members' PHI, in whole or in part, constitutes medical information as defined under FCRA.  SAIC also violated FCRA by failing to specifically safeguard, protect and limit the dissemination of Plaintiffs' and Class Members' PHI into the public domain.

187.    SAIC's repeated violations of FCRA, as set forth above, were willful or, at the very least, reckless.

188.    As a direct and/or proximate result of SAIC's willful violations of FCRA, as described above, Plaintiffs' and Class Members' PHI was disclosed and made accessible to unauthorized third parties in the public domain.

189.    As a further direct and/or proximate result of SAIC's willful violations of FCRA, as described above, Plaintiffs and Class Members suffered actual damages in the form of, *inter alia*, (i) loss of privacy, (ii) the imminent, immediate and continuing increased risk of identity theft, identity fraud and/or medical fraud, (iii) out-of-pocket expenses to purchase credit monitoring, internet monitoring, identity theft insurance and/or other Data Breach risk mitigation products, (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (v) the value of their time spent mitigating the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (vi) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, and/or (vii) the diminished value of the services they paid TRICARE to provide.  SAIC's willful wrongful actions and/or inaction violated FCRA.

190.    Plaintiffs and Class Members, therefore, are entitled to compensation for their actual damages or statutory damages of not less than $100, and not more than $1000, per Class

Member, as well as their attorneys' fees, litigation expenses, and costs, pursuant to 15 U.S.C

§1681n(a).

## COUNT IV

### NEGLIGENT VIOLATION OF THE FAIR CREDIT REPORTING ACT
### (15 U.S.C. § 1681, *et seq*.)
### (Nationwide Class Against SAIC)

191.    The preceding factual statements and allegations are incorporated herein by reference.

192.    In the alternative to Count III, and as described above, SAIC negligently violated FCRA by failing to design, adopt, implement, control, direct, oversee manage, monitor and/or audit the appropriate processes, controls, policies, procedures and/or protocols to safeguard, protect and limit the dissemination of consumer credit, personnel, insurance, and other information (such as Plaintiffs' and Class Members' PII/PHI) for the permissible purposes outlined by FCRA which, in turn, directly and/or proximately resulted in the Data Breach and wrongful dissemination of Plaintiffs' and Class Members' PII/PHI into the public domain.

193.    It was reasonably foreseeable that SAIC's failure to design, adopt, implement, control, direct, oversee manage, monitor and/or audit the appropriate processes, controls, policies, procedures and/or protocols to safeguard, protect and limit the dissemination of Plaintiffs' and Class Members' PII/PHI would result in an unauthorized third party gaining access to their PII/PHI for no permissible purpose under FCRA.

194.    As a direct and/or proximate result of SAIC's negligent violations of FCRA, as described above, Plaintiffs' and Class Members' PII/PHI was stolen and made accessible to unauthorized third parties in the public domain.

195.    As a further direct and/or proximate result of SAIC's negligent violations of FCRA, as described above, Plaintiffs and Class Members suffer (and continue to suffer) damages in the form of, *inter alia*, (i) loss of privacy, (ii) the imminent, immediate and continuing increased risk of identity theft, identity fraud and/or medical fraud, (iii) out-of-pocket expenses to purchase credit monitoring, internet monitoring, identity theft insurance and/or other Data Breach risk mitigation products, (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (v) the value of their time spent mitigating the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (vi) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, and/or (vii) the diminished value of the services they paid TRICARE to provide.   SAIC's negligent wrongful actions and/or inaction violated FCRA.

196.    Plaintiffs and Class Members, therefore, are entitled to compensation for their above actual damages, as well as their attorneys' fees, litigation expenses and costs, pursuant to 15 U.S.C. §1681o(a).

## COUNT V

### VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT
#### (Tex. Bus & Com. Code § 17.50(a)(3) (Unconscionable Acts and Practices)) (Nationwide Class and/or Texas Sub-Class Against SAIC)

197.    The preceding factual statements and allegations are incorporated herein by reference.

198.    As described above, Plaintiffs and Class Members are consumers of healthcare-related products and services as the term "consumer" is defined in the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA").   Tex. Bus & Com. Code § 17.45(4).

199.    In order to receive health care coverage, medical and dental care, medical and dental products and services and/or medications, Plaintiffs and Class Members were required to provide their PII/PHI to SAIC, as well as the other Defendants.  At all relevant times, SAIC was (and continues to be) entrusted with, and obligated to protect, Plaintiffs' and Class Members' PII/PHI, as well as the PII/PHI of their families in connection with such consumer transactions.

200.    SAIC's ongoing acts and practices consisting of, *inter alia*, (i) repeatedly failing to properly safeguard and protect the PII/PHI of TRICARE participants entrusted to it (as described in detail above), (ii) failure to properly safeguard, protect and transport Plaintiffs' and Class Members' PII/PHI entrusted to it (as described in detail above), and (iii) failure to properly encrypt all of Plaintiffs' and Class Members' PII/PHI on the stolen data tapes were (and continue to be) glaringly noticeable, flagrant, complete, unmitigated and unconscionable.

201.    SAIC's above unconscionable acts and practices directly and/or proximately caused (and continues to cause) Plaintiffs and Class Members to suffer a glaringly noticeable, flagrant, complete, unmitigated unfairness in the form of, *inter alia*, the wrongful dissemination of their PII/PHI to the world without their authorization.

202.    SAIC's above unconscionable acts and practices—in particular, SAIC's failure to properly safeguard, protect and transport Plaintiffs' and Class Members' PII/PHI entrusted to it—occurred in connection with the provision of health care coverage, medical and dental care, medical and dental products and services and/or medications in consumer transactions to Plaintiffs and Class Members; to wit, in order to receive such health care coverage, medical and dental care, medical and dental products and services and/or medications, Plaintiffs and Class Members were required to provide their PII/PHI to SAIC, as well as the other Defendants.

203. SAIC's above-described willful and wrongful actions and/or inaction were (and continue to be) the direct and/or proximate cause of the damages Plaintiffs and Class Members have suffered (and continue to suffer) in the form of, *inter alia*, (i) loss of privacy, (ii) the imminent, immediate and continuing increased risk of identity theft, identity fraud and/or medical fraud, (iii) out-of-pocket expenses to purchase credit monitoring, internet monitoring, identity theft insurance and/or other Data Breach risk mitigation products, (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (v) the value of their time spent mitigating the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (vi) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, and/or (vii) the diminished value of the services they paid TRICARE to provide—for which they are entitled to compensation.

204. SAIC's wrongful actions and/or inaction (as described above) constitute (and continue to constitute) unconscionable conduct in violation of the DTPA; to wit, ongoing and continuous violations of Tex. Bus & Com. Code § 17.50(a)(3).

## COUNT VI

## INVASION OF PRIVACY BY PUBLIC DISCLOSURE OF PRIVATE FACTS
### (Texas Common Law)
### (Nationwide Class and/or Texas Sub-Class Against SAIC)

205. The preceding factual statements and allegations are incorporated herein by reference.

206. SAIC's intentional failure to safeguard and protect Plaintiffs' and Class Members' PII/PHI directly and/or proximately resulted in the invasion of their privacy by the public disclosure of such highly confidential and private information.

207.     Access to Plaintiffs' and Class Members' PII/PHI, and the wrongful dissemination of such information into the public domain, was easily achieved because the information admittedly was either encrypted improperly or not encrypted at all.

208.     SAIC's wrongful dissemination of Plaintiffs' and Class Members' PII/PHI into the public domain is not of a legitimate public concern; publicity of their PII/PHI would be, is and will continue to be offensive to reasonable people.

209.     SAIC intentionally invaded Plaintiffs' and Class Members' privacy by repeatedly failing and refusing to design, adopt, implement, control, direct, oversee, manage, monitor and/or audit appropriate data security processes, controls, policies, procedures and/or protocols of their agents in order to safeguard and protect the PII/PHI entrusted to them—including Plaintiffs' and Class Members' PII/PHI.

210.     Plaintiffs and the Class Members were (and continue to be) damaged as a direct and/or proximate result of SAIC's intentional invasion of their privacy by publicly disclosing their highly confidential and private facts (*i.e.*, their PII/PHI) in the form of, *inter alia*, (i) loss of privacy, (ii) the imminent, immediate and continuing increased risk of identity theft, identity fraud and/or medical fraud, (iii) out-of-pocket expenses to purchase credit monitoring, internet monitoring, identity theft insurance and/or other Data Breach risk mitigation products, (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (v) the value of their time spent mitigating the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (vi) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, and/or (vii) the diminished value of the services they paid TRICARE to provide—for which they are entitled to compensation.

211.    SAIC's wrongful actions and/or inaction (as described above) constituted (and continue to constitute) an invasion of Plaintiffs' and Class Members' privacy by publicly disclosing their private facts (*i.e.*, their PII/PHI).

## COUNT VII

**NEGLIGENCE**
**(Common Law)**
**(Nationwide Class and/or State Sub-Classes Against SAIC)**

212.    The preceding factual statements and allegations are incorporated herein by reference.

213.    SAIC had a duty to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' PII/PHI.

214.    SAIC had (and continues to have) a duty to use ordinary care in activities from which harm might be reasonably anticipated (such as in the storage and transfer of private, non-public PII/PHI within its possession, custody and control), as well as an affirmative duty expressly imposed upon SAIC from other sources as enumerated herein.

215.    SAIC had a duty to hire and supervise trustworthy employees, as well as to design, adopt, implement, control, direct, oversee, manage, monitor and/or audit appropriate data security processes, controls, policies, procedures and/or protocols of their agents in order to safeguard and protect the PII/PHI entrusted to them—including Plaintiffs' and Class Members' PII/PHI.

216.    As described above, SAIC's duty arise from, *inter alia*, FTC standards, HIPAA, HITECH, state data protection statutes[13] and/or SAIC's contract with the Government Defendants.

217.    The standards and duties outlined above are for the express purpose of protecting Plaintiffs, Class Members and their PII/PHI.

218.    SAIC violated these standards and duties by failing to exercise reasonable care by failing to safeguard and protect Plaintiffs' and Class Members' PII/PHI.

219.    It was reasonably foreseeable that SAIC's failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' PII/PHI would result in an unauthorized third party gaining access to such information and disseminating such information to the world for no lawful purpose.

220.    SAIC, by and through its above negligent actions and/or inaction, unlawfully breached its duties to Plaintiffs and Class Members by, among other things, failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' PII/PHI within its possession, custody and control.

221.    SAIC, by and through its above negligent actions and/or inaction, further breached its duties to Plaintiffs and Class Members by failing to design, adopt, implement,

---

[13] Nearly all jurisdictions have statutes recognizing the real risk to consumers from data breaches and, therefore, require timely notice to be sent to data breach victims. *See, e.g.,* Alaska Stat. § 45.48.010, *et seq.*; Cal. Civ. Code § 1798.29; 1798.80, *et seq.*; Cal. Civ. Code § 56, *et seq.*; Conn. Gen Stat 36a-701b, *et seq.*; Colo. Rev. Stat. § 6-1-716; Fla. Stat. § 817.5681; Ga. Code § 10-1-910, *et seq.*, Haw. Rev. Stat. § 487N-2, *et. seq.*; Idaho Code § 28-51-104, *et seq.*; 850 ILCS 550/1, *et seq.*; Ind. Code § 16-39-1-1, *et seq.*; Iowa Code § 715C.1, *et seq.*; La. Rev. Stat. § 51:3071, *et seq.*; Md. Code. Com. Laws § 14-3501, *et seq.*; Mass. Gen. Laws ch. 93H; Mich. Comp. Laws § 445.63, 72, *et seq.*; Miss. Code § 75-24-29, Mo. Rev. Stat. § 407.1500; N.J.S.A. § 56:8-163; N.H. Rev. Stat. § 359-C:19, *et seq.*; N.Y. Gen. Bus. L. § 899-aa; N.C. Gen. Stat. §75-65, *et seq.*; Ohio Rev. Code § 1349.19; 24 Ok. Stat. §§ 161-66; Or. Rev. Stat. §§ 646A.600, *et seq.*; R.I. Gen. Laws § 11-49.2-1, *et seq.*; S.C. code § 39-1-90, *et seq.*; Tenn. Code § 47-18-2107; Tex. Bus. & Com. Code §§ 521.002, *et seq.*; VA Code Ann. § 18.2-186.6 Wash. Rev. Code § 19.255.010, *et seq.* Moreover, many jurisdictions have *additional* statutory framework for the protection of PII or PHI specifically. *See, e.g.,* N.J.S.A. § 56:11-44, *et seq.*; N.J.S.A. 56:8-162; T.C.A. § 68-11-1501 *et seq.*; ORS § 192.553 *et seq.*; ORS § 646A.622; Va. Code Ann. § 32.1-127.1:03.

control, direct, oversee, manage, monitor and audit its processes, controls, policies, procedures and protocols for complying with the applicable laws and safeguarding and protecting Plaintiffs' and Class Members' PII/PHI within its possession, custody and control.

222.    The unauthorized third party access was without Plaintiffs' and Class Members' authorization or consent.

223.    But for SAIC's negligent and wrongful breach of its duties owed to Plaintiffs and Class Members, their PII/PHI would not have been disseminated to the world and compromised.

224.    Plaintiffs' and Class Members' PII/PHI was compromised, viewed, and/or stolen as the direct and/or proximate result of SAIC's failure to design, adopt, implement, control, direct, oversee, manage, monitor and audit its processes, controls, policies, procedures and protocols for complying with the applicable laws and safeguarding and protecting Plaintiffs' and Class Members' PII/PHI within its possession, custody and control.

225.    Plaintiffs and Class Members suffer (and continue to suffer) damages as a direct and/or proximate result of SAIC's failure to secure and protect their PII/PHI in the form of, *inter alia*, (i) loss of privacy, (ii) the imminent, immediate and continuing increased risk of identity theft, identity fraud and/or medical fraud, (iii) out-of-pocket expenses to purchase credit monitoring, internet monitoring, identity theft insurance and/or other Data Breach risk mitigation products, (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (v) the value of their time spent mitigating the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (vi) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, and/or (vii) the diminished value of the services they paid TRICARE to—for which they are entitled to compensation.

226.    SAIC's wrongful actions and/or inaction (as described above) constituted (and continue to constitute) negligence and negligence per se under common law.

## COUNT VIII

### BREACH OF THIRD PARTY BENEFICIARY CONTRACT
### (Common Law)
### (Nationwide Class and/or State Sub-Classes Against SAIC)

227.    The preceding factual statements and allegations are incorporated herein by reference.

228.    SAIC contracts with TRICARE and DOD to, among other things, safeguard and protect Plaintiffs' and Class Members' PII/PHI (the "Care Contracts").

229.    Under the circumstances, and in recognition of a right to performance of the Care Contracts, SAIC, TRICARE and DOD intended to give Plaintiffs and Class Members the benefit of the performance promised by SAIC.

230.    Pursuant to the Care Contracts, Plaintiffs and Class Members are intended third party beneficiaries of the Care Contracts.

231.    SAIC substantially breached the Care Contracts by, *inter alia*, failing to adequately safeguard and protect Plaintiffs' and Class Members' PII/PHI.  SAIC also breached the Care Contracts by, *inter alia*, failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit its processes, controls, policies, procedures and protocols for complying with the applicable laws and safeguarding and protecting Plaintiffs' and Class Members' PII/PHI entrusted to it.

232.    SAIC's breach of the Care Contracts directly and/or proximately caused Plaintiffs and Class Members to suffer (and continue to suffer) damages in the form of, *inter alia*, (i) loss of privacy, (ii) the imminent, immediate and continuing increased risk of identity theft, identity

fraud and/or medical fraud, (iii) out-of-pocket expenses to purchase credit monitoring, internet monitoring, identity theft insurance and/or other Data Breach risk mitigation products, (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (v) the value of their time spent mitigating the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (vi) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, and/or (vii) the diminished value of the services they paid TRICARE to—for which they are entitled to compensation.

### COUNT IX

### BREACH OF IMPLIED-IN-FACT CONTRACT
### (Common Law)
### (Nationwide Class and/or State Sub-Classes Against SAIC)

233.     The preceding factual statements and allegations are incorporated herein by reference.

234.     Plaintiffs and Class Members bring this Count as an alternative to Count VIII.

235.     In order to benefit from their underlying healthcare plans, Plaintiffs and Class Members must provide their PII/PHI to SAIC, as well as the other Defendants.

236.     SAIC benefits from receiving and storing Plaintiffs' and Class Members' PII/PHI electronically as it can more economically process health claims and provide related services.

237.     By providing their PII/PHI to SAIC, and upon SAIC's acceptance of such information, Plaintiffs and Class Members, on the one hand, and SAIC, on the other hand, entered into implied contracts pursuant to which SAIC was (and continues to be) obligated to take reasonable steps to safeguard and protect Plaintiffs' and Class Members' PII/PHI.

238.    Implicit in the implied contract between the Parties is a covenant requiring SAIC to take reasonable efforts to safeguard and protect Plaintiffs' and Class Members' PII/PHI and promptly notify them in the event their information is wrongfully disseminated, lost and/or compromised.

239.    Notwithstanding the obligations imposed on SAIC by its implied contract with Plaintiffs and Class Members, SAIC knowingly breached the contract and failed to safeguard and protect Plaintiffs' and Class Members' PII/PHI by, *inter alia*:

    a.  failing to encrypt Plaintiffs' and Class Members' PII/PHI or otherwise protect the laptops containing Plaintiffs' and Class Members' PII/PHI;

    b.  failing to ensure the confidentiality and integrity of Plaintiffs' and Class Members' PII/PHI it created, received, maintained and/or transmitted in violation of 45 CFR §164.306(a)(1);

    c.  failing to implement technical policies and procedures for electronic information systems that maintain electronic PII/PHI in a manner that only allows access to persons and/or software programs with valid access rights in violation of 45 CFR §164.312(a)(1);

    d.  failing to implement technical policies and procedures that govern the receipt and removal of hardware and electronic media containing electronic PII/PHI in violation of 45 CFR §164.310(d)(1);

    e.  failing to implement policies and procedures to prevent, detect, contain and/or correct security violations in violation of 45 CFR §164.308(a)(1);

    f.  failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic PII/PHI in violation of 45 CFR 164.306(a)(2);

    g.  failing to protect against reasonably anticipated uses or disclosures of electronic PII/PHI that are not permitted under the privacy rules regarding PII/PHI in violation of 45 CFR §164.306(a)(3);

    h.  failing to ensure compliance with the HIPAA security standard rules by its workforce in violation of 45 CFR §164.306(a)(94);

    i.  impermissibly and improperly using and disclosing PII/PHI to unauthorized persons in violation of 45 CFR §164.502 et seq.;

j.  failing to effectively train all members of its workforce (including independent contractors) on the policies and procedures pertaining to safeguarding and protecting PII/PHI in violation of 45 CFR §164.530(b) and 45CFR §164.308(a)(5);

k.  failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit its processes, controls, policies, procedures and protocols for complying with the applicable laws and safeguarding and protecting Plaintiffs' and Class Members' PII/PHI entrusted to it in compliance with 45 CFR §164.530(c); and

l.  otherwise failing to safeguard and protect Plaintiffs' and Class Members' PII/PHI.

240.   As a direct and/or proximate result of SAIC's wrongful actions and/or inaction that breached its implied contract with Plaintiffs and Class Members, Plaintiffs and Class Members have suffered (and will continue to suffer) damages in the form of, *inter alia*, (i) loss of privacy, (ii) the imminent, immediate and continuing increased risk of identity theft, identity fraud and/or medical fraud, (iii) out-of-pocket expenses to purchase credit monitoring, internet monitoring, identity theft insurance and/or other Data Breach risk mitigation products, (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (v) the value of their time spent mitigating the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (vi) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, and/or (vii) the diminished value of the services they paid TRICARE to—for which they are entitled to compensation.

**COUNT X**

**VIOLATION OF STATE DECEPTIVE TRADE PRACTICES
OR CONSUMER PROTECTION ACTS
(State Sub-Classes Against SAIC)**

241.   The preceding factual statements and allegations are incorporated herein by reference.

242.     The uniform publication and advertising of SAIC's commitment to preserving and maintaining the confidentiality and integrity of PII/PHI entrusted to it in connection with the provision of healthcare coverage, products, services and/or medications—including Plaintiffs' and Class Members' PII/PHI—were consumer transactions as defined by the relevant statutes below.

243.     SAIC is a supplier as defined by the relevant statutes below.

244.     Plaintiffs and Class Members are persons and consumers as defined by the relevant statutes below.

245.     SAIC's provision of electronic information management services and cyber security services in connection with the provision of healthcare coverage, products, services and/or medications was (and continues to be) a consumer oriented enterprise having a broad impact on consumers at large within the meaning of the relevant statutes below.

246.     SAIC's uniform publication and advertising of SAIC's commitment to preserving and maintaining the confidentiality and integrity of PII/PHI entrusted to it in connection with the provision of healthcare coverage, products, services and/or medications—including Plaintiffs' and Class Members' PII/PHI that, in fact, SAIC uniformly did not provide to Plaintiffs and Class Members constitute deceptive acts and practices within the meaning of the relevant statutes below.

247.     SAIC violated the relevant statutes below by engaging in the unfair and deceptive practices as described herein, all of which offend public policies and are immoral, unethical, unscrupulous and/or substantially injurious to consumers.

248.    In connection with the Data Breach, SAIC specifically engaged in unfair,

unlawful, unconscionable and/or deceptive acts practices in violation of the statutes below by,

*inter alia*:

a.    uniformly misrepresenting to Plaintiffs and Class Members that their PII/PHI
would be preserved in strictest confidence with the utmost data integrity when, as
alleged herein, SAIC routinely failed to follow corporate or industry standards in
safeguarding and protecting such information;

b.    failing to disclose to Plaintiffs and Class Members the material fact that their
PII/PHI was not preserved in strictest confidence with the utmost data integrity;

c.    failing to design, adopt, implement, control, direct, oversee, manage, monitor and
audit its processes, controls, policies, procedures and protocols for complying
with the applicable laws and safeguarding and protecting Plaintiffs' and Class
Members' PII/PHI within its possession, custody and control;

d.    failing to properly encrypt Plaintiffs' and Class Members' PII/PHI on the stolen
backup data tapes;

e.    failing to properly train its employees in principles of cyber security policies and
procedures including, inter alia, handling and transporting PII/PHI;

f.    failing to comply with state data breach notification statutes by providing not only
tardy  notice, but inadequate, incomplete and misleading notice as described
herein; and

g.    uniformly misleading Plaintiffs and Class Members through their notice program
about the risk of identity theft, identity fraud and/or medical fraud resulting from
the Data Breach.

249.    SAIC's above uniform willfull and wrongful actions and/or inaction, along with

its disregard of cyber security as evidenced by its history of failing to properly safeguard and

protect the PII/PHI of TRICARE participants entrusted to it, were (and continue to be) the direct

and/or proximate cause of the damages Plaintiffs and Class Members have suffered (and

continue to suffer) in the form of, *inter alia*, (i) loss of privacy, (ii) the imminent, immediate and

continuing increased risk of identity theft, identity fraud and/or medical fraud, (iii) out-of-pocket

expenses to purchase credit monitoring, internet monitoring, identity theft insurance and/or other

Data Breach risk mitigation products, (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (v) the value of their time spent mitigating the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (vi) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, and/or (vii) the diminished value of the services they paid TRICARE to—for which they are entitled to compensation.

250.    The injury, harm and damages suffered by Plaintiffs and Class Members sufficiently outweighs any of SAIC's possible justifications or motives for its failure to safeguard and protect Plaintiffs' and Class Members' PII/PHI.

251.    SAIC has lost sensitive PII/PHI entrusted to it on multiple prior occasions. Unless restrained and enjoined, SAIC will continue to engage in the above described wrongful conduct.

252.    SAIC's wrongful actions and/or inaction (as described above) constitute (and continue to constitute) unconscionable conduct in violation of the laws prohibiting unfair and deceptive acts and practices of the states wherein Class members reside.

253.     By its above wrongful actions and/or inaction, SAIC engaged in unfair competition or unfair or deceptive acts or practices in violation of AL Code §8-19-1, *et seq*.

254.    By its above wrongful actions and/or inaction, SAIC engaged in unfair competition or unfair or deceptive acts or practices or make false representations in violation of COLO. REV. STAT. § 6-1-105, *et seq*.

255.    By its above wrongful actions and/or inaction, SAIC engaged in unfair competition or unfair or deceptive acts or practices in violation of FLA. STAT. § 501.201, *et seq*.

256.   By its above wrongful actions and/or inaction, SAIC engaged in unfair competition or unfair or deceptive acts or practices in violation of GA. CODE ANN. § 10-1-392, *et seq.*

257.   By its above wrongful actions and/or inaction, SAIC engaged in unfair competition or unfair or deceptive acts or practices in violation of HAW. REV. STAT. § 480, *et seq.*

258.   By its above wrongful actions and/or inaction, SAIC engaged in unfair competition or unfair or deceptive acts or practices in violation of IDAHO CODE § 48-601, *et seq.*

259.   By its above wrongful actions and/or inaction, SAIC engaged in unfair competition or unfair or deceptive acts or practices in violation of IND. CODE ANN. § 24-5-0.5.1, *et seq.*

260.   By its above wrongful actions and/or inaction, SAIC engaged in unfair competition or unfair or deceptive acts or practices in violation of KY. REV. STAT. § 367.110, *et seq.*

261.   By its above wrongful actions and/or inaction, SAIC engaged in unfair competition or unfair or deceptive acts or practices in violation MASS. GEN. L. CH. 93A, *et seq.*

262.   By its above wrongful actions and/or inaction, SAIC engaged in unfair competition or unfair or deceptive acts or practices in violation of MD. COM. LAW CODE § 13-101, *et seq.*

263.   By its above wrongful actions and/or inaction, SAIC engaged in unfair competition or unfair or deceptive acts or practices in violation of MICH. STAT. § 445.901, *et seq.*

264.    By its above wrongful actions and/or inaction, SAIC engaged in unfair competition or unfair or deceptive acts or practices in violation of MISS. CODE ANN. §75-24-1, *et seq.*

265.    By its above wrongful actions and/or inaction, SAIC engaged in unfair competition or unfair or deceptive acts or practices in violation of MO. REV. STAT. § 407.010, *et seq.*

266.    By its above wrongful actions and/or inaction, SAIC engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. GEN. BUS. LAW § 349, *et seq.*

267.    By its above wrongful actions and/or inaction, SAIC engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. GEN. STAT. § 75-1.1, *et seq.*

268.    By its above wrongful actions and/or inaction, SAIC engaged in unfair competition or unfair or deceptive acts or practices in violation of OHlO REV. STAT. § 1345.01, *et seq.*

269.    By its above wrongful actions and/or inaction, SAIC engaged in unfair competition or unfair or deceptive acts or practices or make false representations in violation of OKLA. STAT. 15 § 751, *et seq.*

270.    By its above wrongful actions and/or inaction, SAIC engaged in unfair competition or unfair or deceptive acts or practices in violation of OR. REV. STAT. § 646.605, *et seq.*

271.    By its above wrongful actions and/or inaction, SAIC engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. CODE LAWS § 39-5-10, *et seq*.

272.    By its above wrongful actions and/or inaction, SAIC engaged in unfair competition or unfair or deceptive acts or practices in violation of TENN. CODE § 47-18-101, *et seq*.

273.    By its above wrongful actions and/or inaction, SAIC engaged in unfair competition or unfair, deceptive and/or unconscionable acts or practices in violation of TEX. BUS. & COM. CODE § 17.41, *et seq*.

274.    By its above wrongful actions and/or inaction, SAIC engaged in unfair competition or unfair or deceptive acts or practices in violation of VA. CODE § 59.1-196, *et seq*.

275.    By its above wrongful actions and/or inaction, SAIC engaged in unfair competition or unfair, deceptive or fraudulent acts or practices in violation of WASH. REV. CODE. § 19.86.010, *et seq*.

276.    As a direct and/or proximate result of SAIC's above statutory violations, Plaintiffs and Class Members have suffered (and continue to suffer) cognizable injury, harm, ascertainable loss and/or actual damages (as set forth above).

## COUNT XI

**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**(California Business & Professions Code §17200 *et seq.*)**
**<u>(California Sub-Class Against SAIC)</u>**

277.    The preceding factual statements and allegations are incorporated herein by reference.

278.    The California Unfair Competition Law, California Business & Professions Code §17200, *et seq*. ("UCL"), prohibits any "unlawful," "fraudulent" or "unfair" business act or practice and any false or misleading advertising, as those terms are defined by the UCL and relevant case law.  By reason of the wrongful actions and/or inaction alleged herein, SAIC engaged in unlawful, unfair and fraudulent practices within the meaning of the UCL.

279.    As alleged herein, the California Plaintiffs and Sub-Class Members have suffered injury in fact and lost money or property as a result of SAIC's wrongful actions and/or inaction including, *inter alia*, the loss of their PII/PHI, monies to which they are entitled by virtue of Defendants' violations of the Confidentiality of Medical Information Act, Civil Code §56 *et seq*. and the Security Requirements for Consumer Records Act, California Civil Code §1798.29 and 1798.80, *et seq*., and costs incurred to protect against the use of and mitigate the loss of the unlawful or unauthorized use of their his confidential PII/PHI.

280.    In the course of conducting business, SAIC committed "unlawful" business practices by, *inter alia*, failing to provide reasonable security measures for the collection, storage and transmission of Plaintiffs' and Class Members' PII/PHI and violated the statutory and common law alleged herein, including the Confidentiality of Medical Information Act and the Security Requirements for Consumer Records Act, California Civil Code §1798.29 and 1798.80, *et seq*.  Plaintiffs and Class Members reserve the right to allege other violations of law that constitute other unlawful business acts or practices.  Such conduct is ongoing and continues to this date.

281.    SAIC also violated the UCL by failing to immediately notify Plaintiffs and Class Members of the theft of their PII/PHI.  If Plaintiffs and Class Members had been notified in an appropriate fashion, they could have taken precautions to safeguard and protect their PII/PHI.

282.    SAIC's wrongful actions and/or inaction, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of California Business and Professions Code §17200 *et seq.*, in that SAIC's conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive and unscrupulous and the gravity of SAIC's conduct outweighs any alleged benefits attributable to such conduct.  There were reasonably available alternatives to further SAIC's legitimate business interests other than the wrongful conduct described herein.

283.    California Business and Professions Code §17200 also prohibits any "fraudulent business act or practice."

284.    SAIC's claims, nondisclosures and misleading statements, as more fully set forth above, were false, misleading and/or likely to deceive the consuming public within the meaning of California Business and Professions Code §17200.

285.    SAIC's wrongful actions and/or inaction caused (and continues to cause) substantial injury to the California Plaintiffs and Sub-Class Members.  SAIC lost sensitive data entrusted to it on multiple prior occasions.  Unless restrained and enjoined, SAIC will continue to engage in the above described wrongful conduct.

286.    The California Plaintiffs, on behalf of themselves, the California Sub-Class Members and the general public, seek restitution and an injunction prohibiting SAIC from continuing such practices and requiring SAIC to take further actions to protect the California Plaintiffs and California Sub-Class Members, as well as all other relief this Court deems appropriate, consistent with Business and Professions Code §17203.

## COUNT XII

**VIOLATION OF CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION
ACT
(California Civil Code § 56 *et seq.*)
(California Sub-Class Against SAIC)**

287.    The preceding factual statements and allegations are incorporated herein by reference.

288.    California Civil Code section 56.10 provides that "[n]o provider of health care, health care service plan, or contract shall disclose medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care plan without first obtaining authorization."

289.    At all relevant times, pursuant to California Civil Code § 56.06(a), SAIC was both a contractor and a health care provider under California law because it had the "purpose of maintaining medical information in order to make the information available to the patient or to a provider of health care at the request of the patient or a provider of health care, for purposes of diagnosis or treatment of the patient."  In particular, SAIC is a privately incorporated business that works to "enable healthcare organizations to manage large volumes of data across multiple enterprises."  In fact, on its website, www.saic.com, SAIC advertises that it is organized to provide its customers with:

SMARTER HEALTHCARE

SAIC helps our customers use technology to deliver care more efficiently, improve care quality and safety, and better protect the health of national and global populations.

290.     SAIC further claims that it works to ensure "healthcare organizations and researchers have immediate access to the information they need to prevent, diagnose, and treat illness and disease."

291.     At all relevant times, SAIC collected, stored, managed and transmitted California Sub-Class Members' PII/PHI and made such information available to TRICARE upon request.

292.     California Civil Code section 56, *et seq*., requires SAIC to implement and maintain standards of confidentiality with respect to all individually identifiable PHI disclosed to it.   Specifically, California Civil Code section 56.10(a) prohibits SAIC from disclosing California Sub-Class Members' PHI without first obtaining the appropriate authorization to do so.

293.     California Civil Code section 56.11 specifies the manner by which authorization must be obtained by providers of health care before PHI is released.   SAIC failed to obtain proper authorization before releasing California Plaintiffs' and California Sub-Class Members' PHI and failed to adopt and maintain the requisite protective procedures required by California law.   As a direct and/or proximate result of SAIC's wrongful actions and/or inaction, California Plaintiffs' and California Sub-Class Members' PHI was wrongfully disseminated to the world. By disclosing California Plaintiffs' and California Sub-Class Members' PHI without their written authorization, SAIC violated California Civil Code §56, *et seq*. and its legal duty to protect the confidentiality of such information.

294.     SAIC also violated Sections 56.06 and 56.101 of the California Confidentiality of Medical Information Act, which prohibits the negligent creation, maintenance, preservation, storage, abandonment, destruction or disposal of confidential PHI.   As a direct and/or proximate

result of SAIC's wrongful actions and/or inaction, California Plaintiffs' and California Sub-Class Members' confidential PHI was wrongfully released and disclosed.

295.    As a direct and/or proximate result of SAIC's wrongful actions and/or inaction, California Plaintiffs and California Sub-Class Members have suffered (and continue to suffer) damages in the form of, *inter alia*, (i) loss of privacy, (ii) the imminent, immediate and continuing increased risk of identity theft, identity fraud and/or medical fraud, (iii) out-of-pocket expenses to purchase credit monitoring, internet monitoring, identity theft insurance and/or other Data Breach risk mitigation products, (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (v) the value of their time spent mitigating the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (vi) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, and/or (vii) the diminished value of the services they paid TRICARE to—for which they are entitled to compensation.

296.    Pursuant to California Civil Code §§56.35 and 56.36(b)(1), therefore, California Plaintiffs and California Sub-Class Members are entitled to appropriate injunctive and declaratory relief against SAIC, an award of statutory liquidated damages of $1,000 per California Plaintiff and California Sub-Class Member, punitive damages of up to $3,000 per California Plaintiff and California Sub-Class Member, attorneys' fees, litigation expenses and court costs.

## COUNT XIII

## VIOLATION OF SECURITY REQUIREMENTS FOR CONSUMER RECORDS
### (California Civil Code §1798.29 and 1798.80, *et seq*.)
### (California Sub-Class Against SAIC)

297.    The preceding factual statements and allegations are incorporated herein by reference.

298.    California law requires any business that obtains PII/PHI from its customers (including financial or personal identification data) to implement and maintain reasonable security procedures and practices to protect such information from unauthorized access, destruction, use, modification or disclosure.

299.    California Civil Code §§1798.29 and 1798.82 further require that any business that obtains and retains PII/PHI from its customers must promptly and "in the most expedient time possible and without unreasonable delay" disclose any breach of the security of the system containing such retained data.

300.    SAIC failed to implement and maintain reasonable security systems, including its failure to properly encrypt and transport California Plaintiffs' and California Sub-Class Members' PII/PHI in a secured manner.

301.    SAIC also unreasonably delayed and failed to disclose the Data Breach to California Plaintiffs and California Sub-Class Members in the most expedient time possible and without unreasonable delay when it knew or reasonably believed such information had been wrongfully disclosed to or acquired by an unauthorized person or persons.

302.    On information and belief, no law enforcement agency determined or instructed SAIC that notification of the Data Breach to California Plaintiffs and California Sub-Class Members would impede a criminal investigation.

96

303.   SAIC also failed to comply with the privacy notification rights required in California Civil Code §1798.83.

304.   As a direct and/or proximate result of SAIC's wrongful actions and/or inaction, California Plaintiffs and California Sub-Class Members have suffered (and will continue to suffer), *inter alia*, (i) loss of privacy, (ii) the imminent, immediate and continuing increased risk of identity theft, identity fraud and/or medical fraud, (iii) out-of-pocket expenses to purchase credit monitoring, internet monitoring, identity theft insurance and/or other Data Breach risk mitigation products, (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (v) the value of their time spent mitigating the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (vi) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, and/or (vii) the diminished value of the services they paid TRICARE to—for which they are entitled to compensation.

## COUNT XIV

**VIOLATION OF THE TENNESSEE PATIENTS' PRIVACY PROTECTION ACT**
**(T.C.A. § 68-11-1501, *et seq.*)**
**(Tennessee Sub-Class Against SAIC)**

305.   The preceding factual statements and allegations are incorporated herein by reference.

306.   SAIC has a statutory duty to keep Tennessee Plaintiffs' and Tennessee Sub-Class Members' PII/PHI confidential because SAIC is the designated data security service provider for Tennessee Plaintiffs and Tennessee Sub-Class Members who have entered and received care at a health care facility with the expectation of and right to privacy for care received at such facility.

307. SAIC wrongfully divulged the confidential PII/PHI of the Tennessee Plaintiffs and Tennessee Sub-Class Members to an unknown party or parties of thieves who obtained the unencrypted and/or improperly encrypted PII/PHI when it was in SAIC's possession and control.

308. SAIC's violation of the Tennessee Patient's Privacy Protection Act was an invasion of Tennessee Plaintiffs' and Tennessee Sub-Class Members' right to privacy.

309. As a direct and/or proximate result of SAIC's wrongful actions and/or inaction, Tennessee Plaintiffs and Tennessee Sub-Class Members have suffered (and will continue to suffer) damages in the form of, *inter alia*, (i) loss of privacy, (ii) the imminent, immediate and continuing increased risk of identity theft, identity fraud and/or medical fraud, (iii) out-of-pocket expenses to purchase credit monitoring, internet monitoring, identity theft insurance and/or other Data Breach risk mitigation products, (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (v) the value of their time spent mitigating the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (vi) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, and/or (vii) the diminished value of the services they paid TRICARE to—for which they are entitled to compensation.

## COUNT XV

## VIOLATION OF THE OREGON PROTECTED HEALTH INFORMATION LAW
### (ORS § 192.553, *et seq*.)
### (Oregon Sub-Class Against SAIC)

310. The preceding factual statements and allegations are incorporated herein by reference.

311.    SAIC's wrongful actions and/or inaction constitute a violation of the Oregon Protected Health Information Law, ORS § 192.553, *et seq*.

312.    As a direct and/or proximate result of SAIC's wrongful actions and/or inaction, Oregon Plaintiffs and Oregon Sub-Class Members have suffered (and will continue to suffer) damages in the form of, *inter alia*, (i) loss of privacy, (ii) the imminent, immediate and continuing increased risk of identity theft, identity fraud and/or medical fraud, (iii) out-of-pocket expenses to purchase credit monitoring, internet monitoring, identity theft insurance and/or other Data Breach risk mitigation products, (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (v) the value of their time spent mitigating the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (vi) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, and/or (vii) the diminished value of the services they paid TRICARE to—for which they are entitled to compensation.

## COUNT XVI

### VIOLATION OF THE OREGON CONSUMER IDENTITY THEFT PROTECTION ACT
### (ORS § 646A.622)
### (Oregon Sub-Class Against SAIC)

313.    The preceding factual statements and allegations are incorporated herein by reference.

314.    SAIC was (and continues to be) required to develop, implement and maintain "reasonable safeguards to protect the security, confidentiality and integrity of the personal information" of Oregon Plaintiffs and Oregon Sub-Class Members (*i.e.*, their PII/PHI) pursuant to ORS § 646A.622.

315.    SAIC improperly or, at the very least, negligently failed to develop, implement and maintain "reasonable safeguards to protect the security, confidentiality and integrity of the personal information" of Oregon Plaintiffs and Oregon Sub-Class Members.

316.    Pursuant to ORS § 646A.604, SAIC also was required to provide proper notice of the breach of security of Oregon Plaintiffs' and Oregon Sub-Class Members' PII/PHI "in the most expeditious time possible and without unreasonable delay."  SAIC, however, failed to do so.

317.    As a direct and/or proximate result of SAIC's wrongful actions and/or inaction, Oregon Plaintiffs and Oregon Sub-Class Members have suffered (and will continue to suffer) damages in the form of, *inter alia*, (i) loss of privacy, (ii) the imminent, immediate and continuing increased risk of identity theft, identity fraud and/or medical fraud, (iii) out-of-pocket expenses to purchase credit monitoring, internet monitoring, identity theft insurance and/or other Data Breach risk mitigation products, (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (v) the value of their time spent mitigating the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (vi) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, and/or (vii) the diminished value of the services they paid TRICARE to—for which they are entitled to compensation.

## COUNT XVII

## VIOLATION OF THE VIRGINIA HEALTH RECORDS PRIVACY ACT
### (Va. Code Ann. § 32.1-127.1:03)
### (Virginia Sub-Class Against Defendant SAIC)

318.    The preceding factual statements and allegations are incorporated herein by reference.

319.    SAIC's above wrongful actions, inaction and misfeasance constitute an invasion of privacy under Va. Code Ann. § 32.1-127.1:03.

320.    SAIC's actions were not within the scope of any exception to the nondisclosure mandate of this statute.

321.    As a direct and/or proximate result of SAIC's wrongful actions and/or inaction, Virginia Plaintiffs and Virginia Class Members have suffered (and will continue to suffer) damages in the form of, *inter alia*, (i) loss of privacy, (ii) the imminent, immediate and continuing increased risk of identity theft, identity fraud and/or medical fraud, (iii) out-of-pocket expenses to purchase credit monitoring, internet monitoring, identity theft insurance and/or other Data Breach risk mitigation products, (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (v) the value of their time spent mitigating the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (vi) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, and/or (vii) the diminished value of the services they paid TRICARE to—for which they are entitled to compensation.

## COUNT XVIII

**TORT OF WRONGFUL DISCLOSURE OF MEDICAL INFORMATION**
**(Common Law)**
**(Virginia and Ohio Sub-Classes Against SAIC)**

322.    The preceding factual statements and allegations are incorporated herein by reference.

323.    SAIC was (and continues to be) under a duty to safeguard and protect Virginia and Ohio Plaintiffs', Virginia Sub-Class Members' and Ohio Sub-Class Members' PII/PHI entrusted to it in confidence and not disclose such information without the patient's prior authorization.

324.    At the very least, SAIC was careless in safeguarding and protecting Virginia and Ohio Plaintiffs', Virginia Sub-Class Members' and Ohio Sub-Class Members' PII/PHI entrusted to it.

325.    SAIC's carelessness resulted in the improper disclosure of Virginia and Ohio Plaintiffs', Virginia Sub-Class Members' and Ohio Sub-Class Members' entrusted to it in confidence.

326.    As a direct and/or proximate result of SAIC's wrongful actions and/or inaction, Virginia and Ohio Plaintiffs, Virginia Sub-Class Members and Ohio Sub-Class Members have suffered (and will continue to suffer) damages in the form of, *inter alia*, (i) loss of privacy, (ii) the imminent, immediate and continuing increased risk of identity theft, identity fraud and/or medical fraud, (iii) out-of-pocket expenses to purchase credit monitoring, internet monitoring, identity theft insurance and/or other Data Breach risk mitigation products, (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (v) the value of their time spent mitigating the

increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (vi) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, and/or (vii) the diminished value of the services they paid TRICARE to—for which they are entitled to compensation.

## COUNT XIX

### UNJUST ENRICHMENT
### (Common Law)
### <u>(Nationwide Class Against SAIC)</u>

327.     The preceding factual statements and allegations are incorporated herein by reference.

328.     Plaintiffs, on behalf of themselves and Class Members, hereby plead this Count in the alternative.

329.     Plaintiffs and Class Members conferred a monetary benefit on SAIC in the form of a portion of the monthly medical and dental insurance premiums they paid.

330.     SAIC appreciated (and continues to appreciate) such monetary benefit.

331.     A portion of the monthly medical and dental insurance premiums paid by Plaintiffs and Class Members was used to pay for the administrative costs of electronic data management services and cyber security services.

332.     In light of the Data Breach, and under principles of equity and good conscience, SAIC should not be permitted to retain that portion of the monthly medical and dental insurance premiums paid by Plaintiffs and Class Members supposedly used to pay for the administrative costs of electronic data management services and cyber security services that SAIC, in fact, failed to provide.

333.     Accordingly, Plaintiffs, on behalf of themselves and the Class Members, seek to impose a constructive trust over (and recover) all amounts by which SAIC has been (and continues to be) unjustly enriched.  Plaintiffs and Class Members are entitled to restitution and/or the disgorgement of SAIC's ill-gotten gains pursuant to common law.

### COUNT XX

### DECLARATORY RELIEF
### (28 U.S.C. § 2201, *et seq.*)
### <u>(Nationwide Class Against All Defendants)</u>

334.     The preceding factual statements and allegations are incorporated herein by reference.

335.     An actual, justiciable controversy, over which this Court has jurisdiction, now exists between the Parties relating to the legal rights and duties of Plaintiffs, Class Members and Defendants for which Plaintiffs and Class Members desire a declaration of rights.   This controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment pursuant to 28 U.S.C. § 2201.

336.     A declaratory judgment is necessary to determine Plaintiffs' and Class Members' rights in connection with Defendants' failure to safeguard and protect Plaintiffs' and Class Members' PII/PHI (as set forth in detail above).

337.     Plaintiffs, on behalf of themselves and Class Members, therefore, seek a declaratory judgment that Defendants, collectively or individually, violated the APA, the Privacy Act, the FCRA and/or the statutes and/or common law of the various states set forth above. Plaintiffs, on behalf of themselves and Class Members, also seek a declaratory judgment that they are the intended third-party beneficiaries to the Care Contracts between the Defendants.

## RELIEF REQUESTED

338.    The preceding factual statements and allegations are incorporated herein by reference.

339.    **DAMAGES.**  As a direct and/or proximate result of Defendants' wrongful actions and/or inaction (as described above), Plaintiffs and Class Members suffered (and continue to suffer) damages in the form of, *inter alia*, (i) loss of privacy, (ii) the imminent, immediate and continuing increased risk of identity theft, identity fraud and/or medical fraud, (iii) the cost to purchase adequate credit monitoring, internet monitoring, identity theft insurance and/or other Data Breach risk mitigation products, (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (v) the value of their time spent mitigating the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the Data Breach, (vi) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, and/or (vii) the diminished value of the services they paid TRICARE to—for which they are entitled to compensation. Plaintiffs and Class Members also are entitled to recover statutory damages and/or nominal damages pursuant to the applicable state and federal statutes set forth above.  Plaintiffs' and Class Members' damages were foreseeable by Defendants and exceed the minimum jurisdictional limits of this Court.  All conditions precedent to Plaintiffs' and Class Members' claims have been performed and/or occurred.

340.    **TREBLE DAMAGES.**  Plaintiffs and Class Members also are entitled to treble damages for SAIC's knowing, willful, intentional, unconscionable and deceptive acts and practices under the applicable state statutes set forth above.  All conditions precedent to Plaintiffs' and Classes' claims for relief have been performed and/or occurred.

341.   **PUNITIVE DAMAGES.**   Plaintiffs and Class Members also are entitled to punitive damages from SAIC as punishment and to deter such wrongful conduct in the future.  All conditions precedent to Plaintiffs' and Class Members' claims have been performed and/or occurred.

342.   **INJUNCTIVE RELIEF.**   Plaintiffs and Class Members also are entitled to injunctive relief in the form of, *inter alia*, without limitation, (i) credit monitoring, (ii) internet monitoring, (iii) identity theft insurance, (iv) periodic compliance audits by a third party to insure that Defendants are properly safeguarding and protecting the PII/PHI in their possession, custody and control, and (v) clear and effective notice to Class Members about the serious risks posed by the theft of the PII/PHI and the precise steps that must be taken to protect themselves.  All conditions precedent to Plaintiffs' and Class Members' claims for relief have been performed and/or occurred.

343.   **ATTORNEYS' FEES, LITIGATION EXPENSES AND COSTS.**   Plaintiffs and Class Members also are entitled to recover their attorneys' fees, litigation expenses and court costs in prosecuting this action pursuant to, *inter alia*, 15 U.S.C. §§ 1681n(a); o(a) and applicable the state and federal statutes set forth above.  All conditions precedent to Plaintiffs' and Classes' claims for relief have been performed and/or occurred.

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, respectfully request that (i) this action be certified as a class action, (ii) Plaintiffs be designated the Nationwide Class and/or State Sub-Class Representatives, and (iiiv) Plaintiffs' Counsel be appointed as Class Counsel.  Plaintiffs, on behalf of themselves and Class Members, further request that upon final trial or hearing, judgment be awarded against Defendants for:

(i)      actual damages to be determined by the trier of fact;

(ii)     consequential damages to be determined by the trier of fact;

(iii)    nominal damages;

(iv)    statutory damages;

(v)    treble damages;

(vi)    punitive damages;

(vi)    pre- and post-judgment interest at the highest legal rates applicable;

(vii)    appropriate injunctive and/or declaratory relief, as described above, including injunctive relief requiring Defendants to comply with their obligations to design, adopt, implement, control, direct, oversee manage, monitor and/or audit the appropriate processes, controls, policies, procedures and/or protocols to safeguard and protect PII/PHI with which they have been entrusted in compliance with their internal policies and procedures, industry standards and all applicable laws and regulations, providing the appropriate and effective monitoring services and educating the Class Members;

(viii)    attorneys' fees and litigation expenses;

(ix)    costs of suit; and

(x)    such other and further relief that this Court deems just and proper.


Dated:  October 1, 2012

Respectfully submitted,


By: /s/ *Richard L. Coffman*
Richard L. Coffman
**THE COFFMAN LAW FIRM**
First City Building
505 Orleans St., Suite 505
Beaumont, TX 77701
Telephone: (409) 833-7700
Facsimile: (866) 835-8250
Email: rcoffman@coffmanlawfirm.com

/s/ *Tracy D. Rezvani*
Tracy D. Rezvani (D.C. Bar #464293)
**FINKELSTEIN THOMPSON, LLP**
1077 30th Street, N.W., Suite 150
Washington, D.C. 20007
Telephone: (202) 337-8000
Facsimile: (202) 337-8090
trezvani@finkelsteinthompson.com

**INTERIM CO-LEAD CLASS COUNSEL**

**OTHER PLAINTIFFS' COUNSEL:**

Ben Barnow
Blake A. Strautins
**BARNOW AND ASSOCIATES, P.C**.
One N. LaSalle Street, Suite 4600
Chicago, IL 60602
Telephone: (312) 621-2000
Facsimile: (312) 641-5504
b.barnow@barnowlaw.com
b.strautins@barnowlaw.com

Timothy G. Blood
Thomas J. O'Reardon II
**BLOOD HURST & O'REARDON, LLP**
701 B Street, Suite 1700
San Diego, CA 92101
Telephone: (619) 338-1100
Facsimile: (619) 338-1101
tblood@bholaw.com
toreardon@bholaw.com
Kevin A. Seely
Gregory E. Del Gaizo
**ROBBINS UMEDA, LLP**
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

kseely@robbinsumeda.com
gdelgaizon@robbinsumeda.com

Alan Dale Harris
Priya Mohan
**HARRIS & RUBLE**
6424 Santa Monica Boulevard
Los Angeles, CA 90038
Telephone: (323) 962-3777
Facsimile: (323) 962-3004
aharris@harrisandruble.com
pmohan@harrisandruble.com

Darryl Antonio Stallworth
**LAW OFFICE OF DARRYL A. STALLWORTH**
2355 Broadway, Suite 303
Oakland, CA 94612
Telephone: (510) 271-1900
Facsimile: (510) 271-1902
dstallworth@thebusinesslawyers.com

Jeffrey I. Carton
Jeremiah Frei-Pearson
**MEISELMAN, DENLEA, PACKMAN, CARTON & EBERZ, P.C.**
1311 Mamaroneck Avenue
White Plains, NY 10605
Telephone: (914) 517-5000
Facsimile: (914) 517-5055
jcarton@mdpcelaw.com
jfrei-pearson@mdpcelaw.com

Andrew N. Friedman
Agnieszka M. Fryszman
Stephanie M. Ramirez
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue, NW
Suite 500 West
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
afriedman@cohenmilstein.com
sramirez@cohenmilstein.com
afryszman@cohenmilstein.com

Richard E. Shevitz
Lynn A. Toops
**COHEN & MALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
Facsimile: (317) 636-2593
rshevitz@cohenandmalad.com
ltoops@cohenandmalad.com

David S. Wachen
**SHULMAN, ROGERS, GANDAL, PORDY & ECKER, P.A.**
12505 Park Potomac Avenue, 6th Floor
Potomac, MD 20854
Telephone: (301) 231-0954
Facsimile: (301) 230-2891
dwachen@shulmanrogers.com

Robert T. Thopy
**MCNEELY, STEPHENSON, THOPY, & HARROLD**
2150 Intelliplex Dr., Suite 100
Shelbyville, IN 46176
Telephone: (317) 825-5110
Facsimile: (317) 825-5109

Peter J. Mougey
James L. Kauffman
**LEVIN PAPANTONIO THOMAS MITCHELL RAFFERTY & PROCTOR, P.A.**
316 South Baylen Street, Suite 600
Pensacola, Florida 32502-5996
Telephone: (850) 435-7068
Facsimile: (850) 436-6068
pmougey@levinlaw.com
jkauffman@levinlaw.com

Richard Acocelli
Mark D. Smilow
**WEISS LAW, LLP**
1500 Broadway, Suite 1600
New York, NY 10036
Telephone: (212) 682-3025
Facsimile: (212) 682-3010
racocelli@weisslawllp.com
msmilow@weisslawllp.com

Jamie L. Sheller
**SHELLER, P.C.**
1528 Walnut Street, 4th Floor
Philadelphia, Pennsylvania 19102
Telephone: (215) 790-7300
Facsimile: (215) 546-0942
jlsheller@sheller.com


## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2012, I electronically filed the foregoing Consolidated Amended Class Action Complaint with the Clerk of Court by using the CM/ECF system, which will send notification of such filing via electronic mail to all counsel of record, including the following counsel of record for Defendants.


/s/ *Richard L. Coffman*
Richard L. Coffman

**INTERIM CO-LEAD CLASS COUNSEL**


Luke M. Jones
Paul Freeborne
Trial Attorneys
**U.S. DEPARTMENT OF JUSTICE CIVIL DIVISION,**
 **FEDERAL PROGRAMS BRANCH**
20 Massachusetts Avenue, NW
Room 6126
Washington, DC 20530
Telephone: (202) 514-3770
Facsimile: (202) 616-8460
luke.jones@usdoj.gov
Paul.freeborne@usdoj.gov

**COUNSEL FOR THE GOVERNMENT DEFENDANTS**

Mark S. Melodia
Gunjan Rashmikant Talati
Lawrence S. Sher
**REED SMITH, LLP**
Princeton Forrestal Village
136 Main Street, Suite 250
P.O. Box 7839
Princeton, NJ 08543
Telephone: (609) 987-0050
Facsimile: (609) 951-0824
MMelodia@reedsmith.com
gtalati@reedsmith.com
lsher@reedsmith.com

Kenneth L. Chernof
Robert J. Katerberg
**ARNOLD & PORTER LLP**
555 Twelfth Street, N.W.
Washington, DC 20004-1206
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
Ken.Chernof@aporter.com
Robert.katerberg@aporter.com

**COUNSEL FOR DEFENDANT SAIC**